# STEWART *v.* DUTRA CONSTRUCTION CO.

No. 03–814.   Argued November 1, 2004—Decided February 22, 2005

482

THOMAS, J., delivered the opinion of the Court, in which all other Members joined, except REHNQUIST, C. J., who took no part in the decision of the case.

*David B. Kaplan* argued the cause for petitioner. With him on the briefs were *Thomas M. Bond, David W. Robertson,* and *Michael F. Sturley.*

*Lisa S. Blatt* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were former *Solicitor General Olson, Deputy Solicitor General Hungar, Howard M. Radzely, Allen H. Feldman,* and *Mark S. Flynn.*

*Frederick E. Connelly, Jr.,* argued the cause for respondent. With him on the brief were *Harvey Weiner* and *John J. O'Connor.**

---

*Briefs of *amici curiae* urging reversal were filed for the Association of Trial Lawyers of America by *John W. deGravelles* and *David S. Casey, Jr.;* for Diamond Offshore Drilling, Inc., et al. by *James Patrick*

JUSTICE THOMAS delivered the opinion of the Court.

The question in this case is whether a dredge is a "vessel" under § 2(3)(G) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat., pt. 2, p. 1425, as added by § 2(a) of Pub. L. 98–426, 33 U. S. C. § 902(3)(G). We hold that it is.

I

As part of Boston's Central Artery/Tunnel Project, or "Big Dig," the Commonwealth of Massachusetts undertook to extend the Massachusetts Turnpike through a tunnel running beneath South Boston and Boston Harbor to Logan Airport. The Commonwealth employed respondent Dutra Construction Company to assist in that undertaking. At the time, Dutra owned the world's largest dredge, the *Super Scoop*, which was capable of digging the 50-foot-deep, 100-foot-wide, three-quarter-mile-long trench beneath Boston Harbor that is now the Ted Williams Tunnel.

The *Super Scoop* is a massive floating platform from which a clamshell bucket is suspended beneath the water. The bucket removes silt from the ocean floor and dumps the sediment onto one of two scows that float alongside the dredge. The *Super Scoop* has certain characteristics common to seagoing vessels, such as a captain and crew, navigational lights, ballast tanks, and a crew dining area. But it lacks others. Most conspicuously, the *Super Scoop* has only limited means of self-propulsion. It is moved long distances by tugboat. (To work on the Big Dig, it was towed from its home base in California through the Panama Canal and up the eastern seaboard to Boston Harbor.) It navigates short distances by manipulating its anchors and cables. When dredging the

*Cooney;* and for the United Brotherhood of Carpenters and Joiners of America by *John R. Hillsman* and *John T. DeCarlo.*

Briefs of *amici curiae* urging affirmance were filed for the Signal Mutual Indemnity Association by *John J. Walsh;* and for T. W. LaQuay Dredging, Inc., by *Gus David Oppermann V.*

Boston Harbor trench, it typically moved in this way once every couple of hours, covering a distance of 30-to-50 feet each time.

Dutra hired petitioner Willard Stewart, a marine engineer, to maintain the mechanical systems on the *Super Scoop* during its dredging of the harbor. At the time of Stewart's accident, the *Super Scoop* lay idle because one of its scows, *Scow No. 4*, had suffered an engine malfunction and the other was at sea. Stewart was on board *Scow No. 4*, feeding wires through an open hatch located about 10 feet above the engine area. While Stewart was perched beside the hatch, the *Super Scoop* used its bucket to move the scow. In the process, the scow collided with the *Super Scoop*, causing a jolt that plunged Stewart headfirst through the hatch to the deck below. He was seriously injured.

Stewart sued Dutra in the United States District Court for the District of Massachusetts under the Jones Act, 38 Stat. 1185, as amended, 41 Stat. 1007 and 96 Stat. 1955, 46 U. S. C. App. § 688(a), alleging that he was a seaman injured by Dutra's negligence. He also filed an alternative claim under § 5(b) of the LHWCA, 33 U. S. C. § 905(b), which authorizes covered employees to sue a "vessel" owner as a third party for an injury caused by the owner's negligence.

Dutra moved for summary judgment on the Jones Act claim, arguing that Stewart was not a seaman. The company acknowledged that Stewart was "a member of the [*Super Scoop*'s] crew," 230 F. 3d 461, 466 (CA1 2000); that he spent "[n]inety-nine percent of his time while on the job" aboard the *Super Scoop*, App. 20 (Defendant's Memorandum in Support of Summary Judgment); and that his "duties contributed to the function" of the *Super Scoop*, *id.*, at 32. Dutra argued only that the *Super Scoop* was not a vessel for purposes of the Jones Act. Dutra pointed to the Court of Appeals' en banc decision in *DiGiovanni* v. *Traylor Brothers, Inc.*, 959 F. 2d 1119 (CA1 1992), which held that "if a

barge . . . or other float's purpose or primary business is *not* navigation or commerce, then workers assigned thereto for its shore enterprise are to be considered seamen only when it is in actual navigation or transit" at the time of the plaintiff's injury. *Id.*, at 1123 (internal quotation marks omitted). The District Court granted summary judgment to Dutra, because the *Super Scoop*'s primary purpose was dredging rather than transportation and because it was stationary at the time of Stewart's injury.

On interlocutory appeal, the Court of Appeals affirmed, concluding that it too was bound by *DiGiovanni.* 230 F. 3d, at 467–468. The court reasoned that the *Super Scoop*'s primary function was construction and that "[a]ny navigation or transportation that may be required is incidental to this primary function." *Id.*, at 468. The court also concluded that the scow's movement at the time of the accident did not help Stewart, because his status as a seaman depended on the movement of the *Super Scoop* (which was stationary) rather than the scow. *Id.*, at 469.

On remand, the District Court granted summary judgment in favor of Dutra on Stewart's alternative claim that Dutra was liable for negligence as an owner of a "vessel" under the LHWCA, 33 U. S. C. § 905(b). The Court of Appeals again affirmed. It noted that Dutra had conceded that the *Super Scoop* was a "vessel" for purposes of § 905(b), explaining that "the LHWCA's definition of 'vessel' is 'significantly more inclusive than that used for evaluating seaman status under the Jones Act.'" 343 F. 3d 10, 13 (CA1 2003) (quoting *Morehead* v. *Atkinson-Kiewit, J/V,* 97 F. 3d 603, 607 (CA1 1996) (en banc)). The Court of Appeals nonetheless agreed with the District Court's conclusion that Dutra's alleged negligence was committed in its capacity as an employer rather than as owner of the vessel under § 905(b).

We granted certiorari to resolve confusion over how to determine whether a watercraft is a "vessel" for purposes of the LHWCA. 540 U. S. 1177 (2004).

## II

Prior to the passage of the Jones Act, general maritime law usually entitled a seaman who fell sick or was injured both to maintenance and cure (or the right to be cared for and paid wages during the voyage, see, *e. g., Harden* v. *Gordon,* 11 F. Cas. 480, 482–483 (No. 6,047) (CC Me. 1823) (Story, J.)), and to damages for any "injuries received . . . in consequence of the unseaworthiness of the ship," *The Osceola,* 189 U. S. 158, 175 (1903). Suits against shipowners for negligence, however, were barred. Courts presumed that the seaman, in signing articles of employment for the voyage, had assumed the risks of his occupation; thus a seaman was "not allowed to recover an indemnity for the negligence of the master, or any member of the crew." *Ibid.*

Congress enacted the Jones Act in 1920 to remove this bar to negligence suits by seamen. See *Chandris, Inc.* v. *Latsis,* 515 U. S. 347, 354 (1995). Specifically, the Jones Act provides:

> "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply." 46 U. S. C. App. § 688(a).

Although the statute is silent on who is a "seaman," both the maritime law backdrop against which Congress enacted the Jones Act and Congress' subsequent enactments provide some guidance.

First, "seaman" is a term of art that had an established meaning under general maritime law. We have thus presumed that when the Jones Act made available negligence remedies to "[a]ny seaman who shall suffer personal injury in the course of his employment," Congress took the term "seaman" as the general maritime law found it. *Chandris,*

*supra,* at 355 (citing *Warner* v. *Goltra,* 293 U. S. 155, 159 (1934)); G. Gilmore & C. Black, Law of Admiralty § 6–21, pp. 328–329 (2d ed. 1975).

Second, Congress provided further guidance in 1927 when it enacted the LHWCA, which provides scheduled compensation to land-based maritime workers but which also excepts from its coverage "a master or member of a crew of any vessel." 33 U. S. C. § 902(3)(G). This exception is simply "a refinement of the term 'seaman' in the Jones Act." *McDermott Int'l, Inc.* v. *Wilander,* 498 U. S. 337, 347 (1991). Thus, the Jones Act and the LHWCA are complementary regimes that work in tandem: The Jones Act provides tort remedies to *sea*-based maritime workers, while the LHWCA provides workers' compensation to *land*-based maritime employees. *Ibid.; Swanson* v. *Marra Brothers, Inc.,* 328 U. S. 1, 6–7 (1946).

Still, discerning the contours of "seaman" status, even with the general maritime law and the LHWCA's language as aids to interpretation, has not been easy. See *Chandris, supra,* at 356. We began clarifying the definition of "seaman" in a pair of cases, *McDermott Int'l, Inc.* v. *Wilander, supra,* and *Chandris, supra,* that addressed the relationship a worker must have to a vessel in order to be a "master or member" of its crew. We now turn to the other half of the LHWCA's equation: how to determine whether a watercraft is a "vessel."

A

Just as Congress did not define the term "seaman" in the Jones Act,[1] it did not define the term "vessel" in the LHWCA

---

[1] The Shipping Act, 1916, defines the term "vessel" for purposes of the Jones Act. See 46 U. S. C. App. § 801. However, the provision of the Jones Act at issue here, § 688(a), speaks not of "vessels," but of "seamen." In any event, because we have identified a Jones Act "seaman" with reference to the LHWCA's exclusion, see 33 U. S. C. § 902(3)(G) ("a master or member of a crew of any vessel"), it is the LHWCA's use of the term "vessel" that matters. And, as we explain, the context surrounding Con-

itself.[2]   However, Congress provided a definition elsewhere. At the time of the LHWCA's enactment, §§ 1 and 3 of the Revised Statutes of 1873 specified:

> "In determining the meaning of the revised statutes, or of any act or resolution of Congress passed subsequent to February twenty-fifth, eighteen hundred and seventy-one, . . . [t]he word 'vessel' includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water."[3]   18 Stat., pt. 1, p. 1.

Sections 1 and 3 show that, because the LHWCA is an Act of Congress passed after February 25, 1871, the LHWCA's use of the term "vessel" "includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *Ibid.*

Section 3's definition, repealed and recodified in 1947 as part of the Rules of Construction Act, 1 U. S. C. § 3, has

---

gress' enactment of the LHWCA suggests that Rev. Stat. § 3, now 1 U. S. C. § 3, provides the controlling definition of the term "vessel" in the LHWCA.

[2] As part of its 1972 Amendments to the LHWCA, Congress amended the Act with what appears at first blush to be a definition of the term "vessel": "Unless the context requires otherwise, the term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.". 33 U. S. C. § 902(21).   However, Congress enacted this definition in conjunction with the third-party vessel owner provision of § 905(b). Rather than specifying the characteristics of a vessel, § 902(21) instead lists the parties liable for the negligent operation of a vessel.   See *McCarthy* v. *The Bark Peking,* 716 F. 2d 130, 133 (CA2 1983) (§ 902(21) is "circular" and "does not provide precise guidance as to what is included within the term 'vessel'").

[3] Congress had used substantially the same definition before, first in an 1866 antismuggling statute, see § 1, 14 Stat. 178, and then in an 1870 statute "provid[ing] for the Relief of sick and disabled Seamen," ch. CLXIX, 16 Stat. 169 (italics deleted); see *id.,* § 7, at 170.

remained virtually unchanged from 1873 to the present.[4] Even now, § 3 continues to supply the default definition of "vessel" throughout the U. S. Code, "unless the context indicates otherwise." 1 U. S. C. § 1. The context surrounding the LHWCA's enactment indicates that § 3 defines the term "vessel" for purposes of the LHWCA.

Section 3 merely codified the meaning that the term "vessel" had acquired in general maritime law. See 1 S. Friedell, Benedict on Admiralty § 165 (rev. 7th ed. 2004). In the decades following its enactment, § 3 was regularly used to define the term "vessel" in maritime jurisprudence. Taking only the issue presented here—whether a dredge is a vessel— prior to passage of the Jones Act and the LHWCA, courts often used § 3's definition to conclude that dredges were vessels.[5]

From the very beginning, these courts understood the differences between dredges and more traditional seagoing vessels. Though smaller, the dredges at issue in the earliest cases were essentially the same as the *Super Scoop* here. For instance, the court could have been speaking equally of the *Super Scoop* as of *The Alabama* when it declared:

> "The dredge and scows have no means of propulsion of their own except that the dredge, by the use of anchors, windlass, and rope, is moved for short distances, as required in carrying on the business of dredging. Both

---

[4] During the 1947 codification, the hyphen was removed from the word "watercraft." § 3, 61 Stat. 633.

[5] See, *e. g., The Alabama,* 19 F. 544, 546 (SD Ala. 1884) (dredge was a vessel and subject to maritime liens); *Huismann* v. *The Pioneer,* 30 F. 206, 207 (EDNY 1886) (dredge was a vessel under § 3); *Saylor* v. *Taylor,* 77 F. 476, 477 (CA4 1896) (dredge was a vessel under § 3, and its workers were seamen); *The International,* 89 F. 484, 484–485 (CA3 1898) (dredge was a vessel under § 3); *Eastern S. S. Corp.* v. *Great Lakes Dredge & Dock Co.,* 256 F. 497, 500–501 (CA1 1919) (type of dredge called a "drillboat" was a vessel under § 3); *Los Angeles* v. *United Dredging Co.,* 14 F. 2d 364, 365– 366 (CA9 1926) (dredge was a vessel under § 3 and its engineers were seamen).

the dredge and the scows are moved from place to place where they may be employed by being towed, and some of the tows have been for long distances and upon the high seas. The dredge and scows are not made for or adapted to the carriage of freight or passengers, and the evidence does not show that, in point of fact, this dredge and scows had ever been so used and employed." *The Alabama,* 19 F. 544, 545 (SD Ala. 1884).

See also *Huismann* v. *The Pioneer,* 30 F. 206 (EDNY 1886). None of this prevented the court from recognizing that dredges are vessels because they are watercraft with "the capacity to be navigated in and upon the waters." *The Alabama, supra,* at 546; see also *The Pioneer, supra,* at 207; *The International,* 89 F. 484, 485 (CA3 1898).

This Court also treated dredges as vessels prior to the passage of the Jones Act and the LHWCA. It did so in a pair of cases, first implicitly in *The "Virginia Ehrman" and the "Agnese,"* 97 U. S. 309 (1878), and then explicitly in *Ellis* v. *United States,* 206 U. S. 246 (1907). In *Ellis,* this Court considered, *inter alia,* whether workers aboard various dredges and scows were covered by a federal labor law. Just as in the present case, one of the *Ellis* appellants argued that the dredges at issue were "vessels" within the meaning of Rev. Stat. §3, now 1 U. S. C. §3. 206 U. S., at 249. The United States responded that dredges were only vessels, if at all, when in actual navigation as they were "towed from port to port." *Id.,* at 253. Citing §3, Justice Holmes rejected the Government's argument, stating that "[t]he scows and floating dredges were vessels" that "were within the admiralty jurisdiction of the United States." *Id.,* at 259.

These early cases show that at the time Congress enacted the Jones Act and the LHWCA in the 1920's, it was settled that §3 defined the term "vessel" for purposes of those statutes. It was also settled that a structure's status as a vessel under §3 depended on whether the structure was a means of maritime transportation. See R. Hughes, Handbook of

Admiralty Law § 5, p. 14 (2d ed. 1920). For then, as now, dredges served a waterborne transportation function, since in performing their work they carried machinery, equipment, and crew over water. See, *e. g., Butler* v. *Ellis,* 45 F. 2d 951, 955 (CA4 1930) (finding the vessel status of dredges "sustained by the overwhelming weight of authority"); *The Hurricane,* 2 F. 2d 70, 72 (ED Pa. 1924) (expressing "no doubt" that dredges are vessels), aff'd, 9 F. 2d 396 (CA3 1925).

This Court's cases have continued to treat § 3 as defining the term "vessel" in the LHWCA, and they have continued to construe § 3's definition in light of the term's established meaning in general maritime law. For instance, in *Norton* v. *Warner Co.,* 321 U. S. 565 (1944), the Court considered whether a worker on a harbor barge was "a master or member of a crew of any vessel" under the LHWCA, 33 U. S. C. § 902(3)(G). In finding that the "barge [was] a vessel within the meaning of the Act," the Court not only quoted § 3's definition of the term "vessel," but it also cited in support of its holding several earlier cases that had held dredges to be vessels based on the general maritime law. 321 U. S., at 571, and n. 4. This Court therefore confirmed in *Norton* that § 3 defines the term "vessel" in the LHWCA and that § 3 should be construed consistently with the general maritime law. Since *Norton,* this Court has often said that dredges and comparable watercraft qualify as vessels under the Jones Act and the LHWCA.[6]

---

[6] See, *e. g., Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.,* 513 U. S. 527, 535, and n. 1 (1995) (indicating that a stationary crane barge was a "vessel" under the Extension of Admiralty Jurisdiction Act); *Southwest Marine, Inc.* v. *Gizoni,* 502 U. S. 81, 92 (1991) (holding that a jury could reasonably find that floating platforms were "vessels in navigation" under the Jones Act); *Jones & Laughlin Steel Corp.* v. *Pfeifer,* 462 U. S. 523, 528–530 (1983) (treating coal barge as a "vessel" under the LHWCA, 33 U. S. C. § 905(b)); cf. *Senko* v. *LaCrosse Dredging Corp.,* 352 U. S. 370, 372 (1957) (assuming that a dredge was a Jones Act vessel); *id.,* at 375, n. 1 (Harlan, J., dissenting) (same).

B

Despite this Court's reliance on § 3 in cases like *Ellis* and *Norton,* Dutra argues that the Court has implicitly narrowed § 3's definition. Section 3 says that a "vessel" must be "used, or capable of being used, as a means of transportation on water." 18 Stat., pt. 1, p. 1. In a pair of cases, the Court held that a drydock, *Cope* v. *Vallette Dry Dock Co.,* 119 U. S. 625, 630 (1887), and a wharfboat attached to the mainland, *Evansville & Bowling Green Packet Co.* v. *Chero Cola Bottling Co.,* 271 U. S. 19, 22 (1926), were not vessels under § 3, because they were not *practically* capable of being used to transport people, freight, or cargo from place to place. According to Dutra, *Cope* and *Evansville* adopted a definition of "vessel" narrower than § 3's text.

Dutra misreads *Cope* and *Evansville.* In *Cope,* the plaintiff sought a salvage award for having prevented a drydock from sinking after a steamship collided with it. 119 U. S., at 625–626. At the time of the accident, the drydock, a floating dock used for repairing vessels, was "moored and lying at [the] usual place" it had occupied for the past 20 years. *Id.,* at 626. In those circumstances, the drydock was a "fixed structure" that had been "permanently moored," rather than a vessel that had been temporarily anchored. *Id.,* at 627. *Evansville* involved a wharfboat secured by cables to the mainland. Local water, electricity, and telephone lines all ran from shore to the wharfboat, evincing a "permanent location." 271 U. S., at 22. And the wharfboat, like the drydock in *Cope,* was neither "taken from place to place" nor "used to carry freight from one place to another." 271 U. S., at 22. As in *Cope,* the Court concluded that the wharfboat "was not practically capable of being used as a means of transportation." 271 U. S., at 22.

*Cope* and *Evansville* did no more than construe § 3 in light of the distinction drawn by the general maritime law between watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the

ocean floor. See, *e. g., The Alabama,* 19 F., at 546 (noting that vessels possess "mobility and [the] capacity to navigate," as distinct from fixed structures like wharves, drydocks, and bridges). Simply put, a watercraft is not "capable of being used" for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement.

This distinction is sensible: A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again. See *Pavone* v. *Mississippi Riverboat Amusement Corp.,* 52 F. 3d 560, 570 (CA5 1995) (floating casino was no longer a vessel where it "was moored to the shore in a semi-permanent or indefinite manner"); *Kathriner* v. *Unisea, Inc.,* 975 F. 2d 657, 660 (CA9 1992) (floating processing plant was no longer a vessel where a "large opening [had been] cut into her hull," rendering her incapable of moving over the water). Even if the general maritime law had not informed the meaning of § 3, its definition would not sweep within its reach an array of fixed structures not commonly thought of as capable of being used for water transport. See, *e. g., Leocal* v. *Ashcroft, ante,* at 9 ("When interpreting a statute, we must give words their 'ordinary or natural' meaning" (quoting *Smith* v. *United States,* 508 U. S. 223, 228 (1993))).

Applying § 3 brings within the purview of the Jones Act the sorts of watercraft considered vessels at the time Congress passed the Act. By including special-purpose vessels like dredges, § 3 sweeps broadly, but the other prerequisites to qualifying for seaman status under the Jones Act provide some limits, notwithstanding § 3's breadth. A maritime worker seeking Jones Act seaman status must also prove that his duties contributed to the vessel's function or mission,

and that his connection to the vessel was substantial both in nature and duration. *Chandris*, 515 U. S., at 376. Thus, even though the *Super Scoop* is a "vessel," workers injured aboard the *Super Scoop* are eligible for seaman status only if they are "master[s] or member[s]" of its crew.

## C

The Court of Appeals, relying on its previous en banc decision in *DiGiovanni* v. *Traylor Brothers, Inc.*, 959 F. 2d 1119 (CA1 1992), held that the *Super Scoop* is not a "vessel" because its primary purpose is not navigation or commerce and because it was not in actual transit at the time of Stewart's injury. 230 F. 3d, at 468–469. Neither prong of the Court of Appeals' test is consistent with the text of § 3 or the established meaning of the term "vessel" in general maritime law.

Section 3 requires only that a watercraft be "used, or capable of being used, as a means of transportation on water" to qualify as a vessel. It does not require that a watercraft be used *primarily* for that purpose. See *The Alabama, supra,* at 546; *The International,* 89 F., at 485. As the Court of Appeals recognized, the *Super Scoop*'s "function was to move through Boston Harbor, . . . digging the ocean bottom as it moved." 343 F. 3d, at 12. In other words, the *Super Scoop* was not only "capable of being used" to transport equipment and workers over water—it *was* used to transport those things. Indeed, it could not have dug the Ted Williams Tunnel had it been unable to traverse the Boston Harbor, carrying with it workers like Stewart.

Also, a watercraft need not be in motion to qualify as a vessel under § 3. Looking to whether a watercraft is motionless or moving is the sort of "snapshot" test that we rejected in *Chandris*. Just as a worker does not "oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured," *Chandris*, 515 U. S., at 363, neither does a watercraft pass in and out of Jones Act coverage

depending on whether it was moving at the time of the accident.

Granted, the Court has sometimes spoken of the requirement that a vessel be "in navigation," *id.*, at 373–374, but never to indicate that a structure's locomotion at any given moment mattered. Rather, the point was that structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time. *Ibid.; Roper* v. *United States,* 368 U. S. 20, 21, 23 (1961); *West* v. *United States,* 361 U. S. 118, 122 (1959). The Court did not mean that the "in navigation" requirement stood apart from § 3, such that a "vessel" for purposes of § 3 might nevertheless not be a "vessel in navigation" for purposes of the Jones Act or the LHWCA. See, *e. g., United States* v. *Templeton,* 378 F. 3d 845, 851 (CA8 2004) ("[T]he definition of 'vessel in navigation' under the Jones Act is not as expansive as the general definition of 'vessel'").

Instead, the "in navigation" requirement is an element of the vessel status of a watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation. A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one. *Supra,* at 493. In some cases that inquiry may involve factual issues for the jury, *Chandris, supra,* at 373, but here no relevant facts were in dispute. Dutra conceded that the *Super Scoop* was only temporarily stationary while Stewart and others were repairing the scow; the *Super Scoop* had not been taken out of service, permanently anchored, or otherwise rendered practically incapable of maritime transport.

Finally, although Dutra argues that the *Super Scoop* is not a "vessel" under § 902(3)(G), which is the LHWCA provision that excludes seamen from the Act's coverage, Dutra con-

ceded below that the *Super Scoop is* a "vessel" under §905(b), which is the LHWCA provision that imposes liability on vessel owners for negligence to longshoremen. The concession was necessary because the Court of Appeals had previously held that §905(b)'s use of the term "vessel" is "'significantly more inclusive than that used for evaluating seaman status under the Jones Act.'" 343 F. 3d, at 13 (quoting *Morehead* v. *Atkinson-Kiewit,* 97 F. 3d, at 607). The Court of Appeals' approach is no longer tenable. The LHWCA does not meaningfully define the term "vessel" as it appears in either §902(3)(G) or §905(b), see n. 2, *supra,* and 1 U.S.C. §3 defines the term "vessel" throughout the LHWCA.

## III

At the time that Congress enacted the LHWCA and since, Rev. Stat. §3, now 1 U.S.C. §3, has defined the term "vessel" in the LHWCA. Under §3, a "vessel" is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment. Because the *Super Scoop* was engaged in maritime transportation at the time of Stewart's injury, it was a vessel within the meaning of 1 U.S.C. §3. Despite the seeming incongruity of grouping dredges alongside more traditional seafaring vessels under the maritime statutes, Congress and the courts have long done precisely that:

> "[I]t seems a stretch of the imagination to class the deck hands of a mud dredge in the quiet waters of a Potomac creek with the bold and skillful mariners who breast the angry waves of the Atlantic; but such and so far-reaching are the principles which underlie the jurisdiction of the courts of admiralty that they adapt themselves to all the new kinds of property and new sets of operatives and new conditions which are brought into existence in the progress of the world." *Saylor* v. *Taylor,* 77 F. 476, 479 (CA4 1896).

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the decision of this case.