# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 26, 2012

No. 11-20047
Summary Calendar

Lyle W. Cayce
Clerk

GRIXI MENDEZ,

Plaintiff - Appellant

v.

ANADARKO PETROLEUM CORPORATION; DEVON ENERGY
CORPORATION; DEVON ENERGY INTERNATIONAL LTD.; DEVON
ENERGY PRODUCTION COMPANY, LP,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:10-CV-1755

Before HIGGINBOTHAM, DAVIS, and ELROD, Circuit Judges.

PER CURIAM:[*]

Grixi Mendez appeals the district court's orders denying his motion to
remand and granting summary judgment to his employer, Anadarko Petroleum
Corporation ("Anadarko"), on his Jones Act claim, 46 U.S.C. § 30104. We affirm
the district court's rulings because the spar upon which Mendez was working
when he was injured was not a Jones Act vessel, meaning there is no possibility

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should
not be published and is not precedent except under the limited circumstances set forth in
5TH CIR. R. 47.5.4.

No. 11-20047

that Mendez can establish that he was a seaman for purposes of Jones Act liability.

**I.**

Mendez, an Anadarko employee, was injured while working on the RED HAWK spar. The RED HAWK is a floating gas-production platform moored in ocean water 5,000 feet deep approximately 210 miles from Sabine Pass, Texas. Spars float on the ocean's surface, but are moored to large anchors in the seabed below. The RED HAWK has been moored in Red Hawk Field at Garden Banks blocks 876 and 877 since 2004. The RED HAWK spar is secured to the ocean floor by a series of six single-point anchor moorings, which extend in a spread platform from the spar's hull. Each mooring is comprised of a chain and polyester line 78 feet long. Each line is anchored to the sea floor with a suction embedment anchor that is approximately 18 feet in diameter. The mooring lines are permanently taut so that the RED HAWK spar cannot move laterally. In addition to these mooring lines, an underwater infrastructure of flow lines and export pipeline systems, as well as umbilicals extending from the spar to the subsea wellheads, used to transport oil and gas to shore-based facilities attach the spar to the ocean floor. A pipeline extends from the spar to the Pelican Gas Plant in Patterson, Louisiana, by way of the VR-397 platform. The gas comes from the wellheads on the sea floor, up through the flow lines, then to the platform. Once on the platform, a separator takes the liquids out, and the gas flows to shore through a sixteen-inch steel pipeline.

Anadarko intended the RED HAWK spar to remain in place for the productive life of the field, which it anticipated would be several years. Production began on July 19, 2004. The field, however, proved less productive

No. 11-20047

than Anadarko expected it to be. After four years, on August 17, 2008, Anadarko stopped extracting from the Red Hawk field. The spar has not, however, been moved, and Anadarko has no plans to move it.

Anadarko commissioned a study of the feasibility of having the spar moved to another field approximately 100 miles away. The study concluded that doing so would take approximately 50 days and cost over $42 million. The actual movement of the spar would take only 2 to 4 of those 50 days; the greatest time and difficulty were presented by preparing to move it and modifying it to anchor in the new location. Only the spar itself would be moved; the mooring system, and the risers and umbilicals, would all have to be severed or disconnected. The mooring system would either be disposed of or left in place. Anadarko would have to build a new mooring system at the new location if it decided to have the spar moved. There are no plans to do so.

Some of the spar's features, including "tow bollards," and the shape of its hull, could facilitate movement from one offshore location to another, but the work and expense needed to unmoor it, prepare it for transportation, and to reattach it to a new location, make that difficult and expensive. As a result, the spar was designed to remain permanently moored to the seabed and stationary for the life of the oil and gas production field. Employees on the RED HAWK spar must perform periodic evacuation drills under Coast Guard rules, and the Coast Guard classifies the spar as an "industrial vessel." These features are, however, consistent with a fixed structure permanently moored far offshore, not merely with vessel status. The Coast Guard's Certificate of Inspection ("COI") also states that the spar is "considered a floating facility with passive ballast systems." The COI states that the RED HAWK is not permitted to carry

3

passengers and notes under the "Route Permitted and Conditions of Operations" section that the spar is "[l]imited to the Gulf of Mexico—Garden Banks Block 876, not on international voyage. The unit is a floating production system of the cell spar design using a synthetic line mooring system, and is considered a floating facility with passive ballast systems."

Mendez brought his Jones Act claim in state court. Anadarko removed the suit to the District Court for the Southern District of Texas, claiming federal jurisdiction under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.*, and arguing that the Jones Act claim did not prevent removal because Mendez did not qualify as a seaman. Mendez filed a motion to remand, which the district court denied after concluding that Mendez could not possibly establish his status as a seaman. The district court then granted Anadarko's motion for summary judgment on the same ground and entered final judgment in favor of Anadarko.

## II.

Mendez argues that the district court erred in refusing to remand this action to state court and in granting summary judgment to Anadarko. We review both a denial of a motion to remand and the grant of summary judgment *de novo*. *Holmes v. Atl. Sounding Co.*, 437 F.3d 441, 445 (5th Cir. 2006).

When a plaintiff brings a Jones Act case, the defendant generally cannot remove the case to federal court. *Id.* If a Jones Act claim is fraudulently pleaded, though, it is removable. *Id.* "[A] district court . . . may use a 'summary judgment-like procedure' to dispose of the assertion that the Jones Act claim was fraudulently pleaded." *Id.* (quoting *Burchett v. Cargill, Inc.*, 48 F.3d 173, 175 (5th Cir. 1995)). "The court may deny remand where, but only where, resolving

No. 11-20047

all disputed facts and ambiguities in current substantive law in the plaintiff's favor, the court determines that the plaintiff has no reasonable possibility of establishing a Jones Act claim on the merits." *Id.*

The issue on appeal is whether Mendez could possibly establish that he was a Jones Act seaman. To qualify as a seaman under the Jones Act, a plaintiff must demonstrate, among other things, that he has "a connection to a vessel in navigation (or an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.* at 368 (internal quotation marks and alteration omitted). The district court determined that Mendez could not establish a connection to a vessel in navigation because the RED HAWK is not a vessel in navigation as the Supreme Court has defined that term. We held that a spar almost identical to the RED HAWK was not a vessel in *Fields v. Poole Offshore*, 182 F.3d 353 (5th Cir. 1999). We therefore agree with the district court's conclusion.

The Supreme Court defined the term "vessel" for Jones Act purposes in *Stewart v. Dutra Construction Co.*, 543 U.S. 481 (2005). It held that a vessel is "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Id.* at 497. A vessel's primary purpose need not be navigation or transportation, and it need not be in motion at the time of the seaman's injury. *Id.* at 495-96. "A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor . . . ." *Id.* at 494. On the other hand, "a watercraft is not 'capable of being used for maritime transport' in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 495.

No. 11-20047

Under this test, the RED HAWK spar is not a vessel. Although the spar floats, it is permanently moored by six mooring lines that are attached to 18-foot anchors deeply embedded into the sea floor under 5,000 feet of water. The mooring lines are 78 feet long. Steel flow lines and export pipelines further attach the spar to extraction points in one direction and to an onshore production facility in Louisiana, by way of another platform, in another direction. The RED HAWK spar is permanently affixed to the sea floor and can only be moved after detaching the substantial moorings and pipelines that have been joined to its structure. The relocation study shows that moving the spar would involve detaching all the moorings and severing the pipelines; would take nearly two months; would cost of $42 million; and would require abandoning the mooring system and building a new mooring system at the new site. The relocation study shows at most that the RED HAWK is theoretically capable of maritime transportation but not practically capable. *See id.* at 496 ("The question remains in all cases whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one.") (internal quotation marks omitted).

In *Stewart*, the Supreme Court discussed approvingly a case from this circuit holding that a "floating casino was no longer a vessel where it 'was moored to the shore in a semi-permanent or indefinite manner" as an example of the "sensible" rule that "ships . . . do not remain vessels merely because of the remote possibility that they may one day sail again." *Id.* at 494 (quoting *Pavone v. Miss. Riverboat Amusement Corp.*, 975 F.3d 560, 570 (5th Cir. 1995)). The RED HAWK makes an even stronger case for non-vessel status. With 50 days and $42 million dollars, one could undoubtedly disconnect the electrical, water,

6

No. 11-20047

telephone, and other hookups that attach a casino boat to the shore, allowing it to move on water. *See id.* at 564 (acknowledging that all that was necessary to disconnect the casino boat from the shore was "removing the steel pins from the ramps [that connected the casino boat to the pier] and letting loose all lines and cables"). Disconnecting the RED HAWK from the sea floor would make disconnecting a casino boat from the shore look as easy as unplugging a toaster. The RED HAWK, therefore, embodies the distinction between theoretical capability, which it has, and practical capability, which it does not. *Stewart*, 543 U.S. at 496 ("The question remains in all cases whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one.") (internal quotation marks omitted).

Because Mendez had no substantial connection to a vessel, there is no reasonable possibility that he can demonstrate seam status under the Jones Act. Therefore, the district court did not err in refusing to remand the case to state court or in granting summary judgment. AFFIRMED.