# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-610


ALBERT ROSS ARMAND

VERSUS

TERRAL RIVER SERVICE, INC.




**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 247,384
HONORABLE HARRY FRED RANDOW, DISTRICT JUDGE

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of Shannon J. Gremillion, Phyllis M. Keaty, and John E. Conery, Judges.


**AFFIRMED.**

**Brian M. Caubarreaux**
**Emily G. Meche**
**Robert M. Marionneaux, Jr.**
**Brian Caubarreaux and Associates**
**Post Office Box 129**
**Marksville, Louisiana 71351**
**(318) 253-0900**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Albert Ross Armand**

**Dan Edward West**
**McGlinchey Stafford**
**301 Main Street, 14th Floor**
**Baton Rouge, Louisiana 70825**
**(225) 383-9000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Terral River Service, Inc.**

**Lake Tindall, LLP**
**Frank S. Thackston**
**Heath S. Douglas**
**Attorney, Pro Hac Vice**
**Post Office Box 918**
**Greenville, Mississippi 38702-0918**
**(662) 378-2121**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Terral River Service, Inc.**

**CONERY, Judge.**

Albert Ross Armand (Mr. Armand) appeals the trial court's ruling granting a motion for summary judgment in favor of his former employer Terral River Service Inc. (Terral). The trial court found that the work platform at issue did not constitute a "vessel" and, thus, Mr. Armand did not qualify as a seaman under the Jones Act, 46 U.S.C.A. § 30104. Mr. Armand's Jones Act case was dismissed with prejudice and at his cost. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Mr. Armand worked for Terral for approximately eight months from June 2012 to February 2013. He was injured on the job and suffered the partial amputation of his right thumb. Mr. Armand had been hired by Terral as an operator/deck hand. His work duties included activities both on the shore and "on water." His on-shore duties included loading fertilizer onto trucks for delivery from Terral's warehouse facility, located just below Alexandria, Louisiana. He also worked on land for approximately three months in the Biloxi-Gulfport, Mississippi, area for Terral, using an excavator to move sand to enlarge the port facility. In his deposition, Mr. Armand estimated that approximately thirty to forty percent of his work time was spent "on the shore."

Mr. Armand's "on water" duties were primarily on a floating, fixed work platform located on the Red River at the Terral facility. The work platform was tied securely with cables to a dolphin, a marine structure moored to the river bottom downstream of the work platform. The work platform was also attached to the river bottom by two sets of three pipes, bound together, and attached at the bow and the stern of the work platform with a system of chains and cables. The pipes

holding the work platform were driven deep into the river bottom. The platform had no navigational function and was fixed in place.

A "track hoe," or excavator, was located on the work platform and was used for offloading fertilizer, rocks, and sand at Terral's location from various transport barges that were moved adjacent to the work platform for that purpose. A hopper for a conveyor system was securely attached to the work platform and the right descending bank of the river and was used to transport cargo from the excavator on the work platform to shore-based storage or transport facilities. In addition, there was also a heavy catwalk attached to the work platform and the river bank, which allowed the work platform to rise and fall with the river level.[1] Mr. Armand estimated in his deposition testimony that approximately sixty to seventy percent of his working time was spent on the work platform.[2]

During his deposition, Mr. Armand and counsel for Terral discussed the procedure for unloading a transport barge when it arrived at the Terral work platform. The barges to be unloaded typically carried fertilizer, sand, and rocks. A "fleet boat"[3] or "line boat"[4] would usually bring two transport barges at a time and push the first barge next to the track hoe on the work platform. The track hoe would then reach out and hold the barge in place while Mr. Armand, or whoever was working, tied the transport barge to the work platform.

---

[1] Mr. Armand testified that during his employment with Terral, the work platform never moved stating, "It's not made to be moved because the hopper is built into the deck itself too."

[2] Mr. Armand testified that "Sixty-five percent" of his work was done on the work platform. When asked if almost all work done on the river was done on that barge, he replied "Yes, sir, on that one barge."

[3] As discussed with Mr. Armand in his deposition, a "fleet boat" would bring the barge to the location and then leave.

[4] Also discussed with Mr. Armand in his deposition, a "line boat" is one that moves up and down the river pushing a number of barges at the same time.

If the transport barge was carrying fertilizer, the fertilizer lids would be removed three at a time and, using the excavator, the fertilizer would then be unloaded. The transport barges carrying rocks and sand were open barges with no lids. The barges would then be systematically unloaded. Once unloaded, the barges would be picked up by a fleet boat or line boat. Deck hands on the fleet or line tow boats were responsible for all mooring operations for the transport barges.

Mr. Armand's deposition testimony confirms that during his employment, he never got on a Terral boat or was attached to a Terral vessel of any kind. The work done for Terral by Mr. Armand was accomplished either on the work platform, on shore, or occasionally, as in this case, on the transport barges removing or replacing the fertilizer lids.[5] He further confirmed that he did not know who owned the tow boats pushing the barges, other than the occasional Terral tow, and he had no involvement in moving the products on the river, only helping the excavator operator unload the materials from the barge onto the shore. Mr. Armand further confirmed in his deposition testimony that he never put "navigation lights on a barge" or "secured a barge to a tow boat." He explained that the tow boats had their own deck hands who would handle the cables and winches on the tow boats to tie down the barge for movement up and down the river.

In February 2013, Mr. Armand and Willard Guillory, the excavator operator, were replacing hopper lids on a fertilizer barge after the fertilizer had been offloaded. Mr. Armand testified that the hopper lid became twisted, and when he attempted to move it, the lid fell, causing a partial amputation of his right thumb.

---

[5] Mr. Armand referred to the work platform as either the "track hoe barge" or "loading rig."

Mr. Armand required two surgeries for his thumb injury and timely began receiving benefits under the Longshore and Harbor Workers' Compensation Act (LHWCA). However, in May 2013, Mr. Armand filed suit against Terral seeking money damages as a Jones Act seaman. Terral then discontinued Mr. Armand's Longshore benefits, and, as he had not reached Maximum Medical Improvement (MMI), began paying Mr. Armand maintenance and cure under the provisions of the Jones Act while his damage claim was pending.

On December 6, 2013, Terral filed a motion for summary judgment claiming that Mr. Armand was not a Jones Act seaman. Terral argued that Mr. Armand would be unable to meet his burden at trial to prove that the work platform at the Terral facility was a "vessel in navigation." On February 24, 2014, the trial court heard the motion and granted summary judgment in favor of Terral, finding, "I am not convinced that this work platform constitutes a vessel. And I don't see anything that raises a material issue of fact regarding that." The trial court signed a judgment on March 24, 2014, dismissing Mr. Armand's Jones Act claim with prejudice and assessing costs to him. Mr. Armand now timely appeals the trial court's ruling.

## ASSIGNMENT OF ERROR

Mr. Armand asserts the following assignment of error on appeal, "The lower Court erroneously applied Louisiana Civil Code of Procedure article 966 in light of the contradictory testimony and /or evidence."

## LAW AND DISCUSSION

### Standard of Review

Summary judgments are reviewed de novo, applying the same standard to the matter as that applied by the trial court. *Smith v. Our Lady of the Lake Hosp.,*

*Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730. Summary judgment is favored by law and provides a vehicle by which the just, speedy, and inexpensive determination of an action may be achieved. La.Code Civ.P. art. 966(A)(2). The trial court is required to render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B)(2). In this case, all documentation supporting and opposing Terral's motion for summary judgment was properly admitted into evidence at the hearing held on February 24, 2014.

In 1997, the legislature enacted La.Code Civ.P. art. 966(C)(2), which clarified the burden of proof in a summary judgment proceeding. The initial burden of proof remains with the mover to show that no genuine issue of material fact exists. If the mover has made a prima facie showing that the motion should be granted, the burden shifts to the non-moving party to present evidence demonstrating that a genuine material factual issue remains. *Id.* "[T]he failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Hutchinson v. Knights of Columbus, Council No. 5747*, 03-1533, p. 7 (La. 2/20/04), 866 So.2d 228, 233.

When a motion for summary judgment is made and supported, the adverse party may not rest on the allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. La.Code Civ.P. art. 967(B). "A fact is 'material' when its existence or nonexistence may be essential to [a] plaintiff's cause of action under the applicable theory of recovery." *Smith*, 639 So.2d at 751. "[F]acts are material if they potentially insure or preclude

5

recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." *Id*. (quoting *S. La. Bank v. Williams*, 591 So.2d 375, 377 (La.App. 3 Cir. 1991), *writ denied*, 596 So.2d 211 (La.1992)).

In determining whether a fact is material, we must consider the substantive law governing the litigation. *Davenport v. Albertson's, Inc.*, 00-685 (La.App. 3 Cir. 12/6/00), 774 So.2d 340, *writ denied*, 01-73 (La. 3/23/01), 788 So.2d 427. In this case, substantive law governing this dispute is the Jones Act and the jurisprudence interpreting its provisions.

### Jones Act Claim

Qualification as a Jones Act seaman requires Mr. Armand to demonstrate the following pursuant to the seminal case of *Chandris, Inc. v. Latsis*, 515 U.S. 347, 115 S.Ct. 2172 (1995): (1) that his duties "contribut[e] to the function of the vessel or to the accomplishment of its mission" and (2) "a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and nature." *Id*. at 368.

However, paramount to any determination of seaman status is the question of whether or not the work platform upon which Mr. Armand admittedly performed sixty to seventy percent of his work for Terral is considered a vessel in navigation. "The determination of whether a given craft is a vessel is ordinarily resolved as a matter of law . . . [h]owever, at the margin, fact issues may be presented." *Manual v. P.A.W. Drilling & Well Serv., Inc*., 135 F.3d 344, 347 (5th Cir. 1998).

The United States Supreme Court in the case of *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 125 S.Ct. 1118 (2005), confirmed that 1 U.S.C. § 3 defines "vessel" for purposes of seaman's status. That statute provides that a "vessel" is "every

6

description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *Id*. at 489. In interpreting that statute, the *Stewart* court instructed that the question is "whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id*. Further, as would apply to this case, *Stewart* instructs that "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id*. at 494.

The United States Supreme Court more recently addressed the issue of "vessel" status in *Lozman v. City of Riviera Beach*, FL., 133 S.Ct. 735 (2013). The Court found that a floating home, which had an unraked hull, rectangular bottom, no capacity to store or generate electricity, no steering mechanism or self-propulsion, and which had been towed several miles to a marina, was not a vessel under 1 U.S.C. § 3. The Supreme Court's analysis in *Lozman* focused on the phrase "capable of being used . . . as a means of transportation on water." *Id*. In citing *Stewart*, the Court held that the "definition" must be applied "in a 'practical,' and not a 'theoretical,' way." *Id*. at 741. Further defining the "practical" application of the phrase, the Supreme Court held, "Consequently, in our view a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." *Id.*

The *Lozman* Court, in keeping with its focus on whether a structure was "designed to a practical degree for carrying people or things over water," cited its previous decision in *Evansville & Bowling Green Packet Co. v. Chero Cola*

*Bottling Co.* 271 U.S. 19, 46 S.Ct. 379 (1926). *Lozman,* 133 S.Ct. at 741. In *Evansville*, the Supreme Court held that "a wharfboat was *not* a 'vessel.'" In *Lozman,* the Supreme Court stated:

> The wharfboat floated next to a dock; it was used to transfer cargo from ship to dock and ship to ship; and it was connected to the dock with cables, utility lines, and a ramp. At the same time, it was capable of being towed. And it was towed each winter to a harbor to avoid river ice. The Court reasoned that, despite the annual movement under tow, the wharfboat "was not used to carry freight from one place to another," nor did it "encounter perils of navigation to which craft used for transportation are exposed."

*Lozman*, 133 S.Ct. at 742.

Therefore, we are now required to make a determination of whether or not there are any genuine issues of material fact as to whether the work platform at issue, upon which Mr. Armand performed most of his duties when employed by Terral, is a "vessel in navigation" pursuant to the definition contained in 1 U.S.C. § 3 as interpreted by the Supreme Court in *Stewart*, *Lozman*, and *Evansville*. *See also Mooney v. W & T Offshore*, 2013 WL 828308 (E.D. La. 2013).

### *Terral's Work Platform*

In support of its motion for summary judgment, Terral submitted the affidavit of Jeffrey Hess, Terral's Special Operations Manager, who attested that the work platform at issue had the following undisputed characteristics:

> 1. The work platform has been secured in its current configuration, with no movement since late 2010.
>
> 2. The work platform is secured to two (2) pipes called "spuds", which are driven deeply and permanently into the Red River, with a system of chains and cables.
>
> 3. The work platform is also securely tied, via cables, to a marine structure known as a dolphin, which is moored to the river bottom placed downstream of the work platform.

4. The work platform has no United States Coast Guard documentation.

5. The work platform has no independent means of propulsion.

6. The work platform does not have a raked bow.

7. The work platform cannot independently navigate.

8. The work platform has no means of steering.

9. The work platform is affixed to right descending bank of the Red River by both a heavy catwalk and an extensive conveyor system. This catwalk and conveyor system is attached to both the bank and the work platform.

10. If the work platform were to be moved, which has not occurred since late 2010, it would involve a long process which would involve at least two (2) tug boats, and five (5) to six (6) personnel.

11. The work platform obviously never moved during Armand's entire time with Terral.

No countervailing affidavits were filed, and no deposition testimony introduced placed any issue relating to the work platform's characteristics in dispute. In this case, the work platform has no United States Coast Guard documentation, no self-propulsion, no raked bow, and could not independently navigate or self-steer. In addition, it has been permanently affixed to both the Red River bottom and bank since 2010 and would require a significant amount of time, two tug boats, and five to six personnel to move.

In *Mendez v. Anadarko Petroleum Corp.*, 466 Fed.Appx. 316, 2012 UL 003575 (C.A. 5 (Tex.) (unpublished opinion), *cert. denied*, 133 S.Ct. 979 (2013)), the Fifth Circuit found that the Red Hawk spar was not a "vessel." The Fifth Circuit's determination that the Red Hawk spar lacked "vessel" status was based on the Supreme Court's opinion in *Stewart*, in particular the portion which stated, "Simply put, a watercraft is not 'capable of being used' for maritime transport in

9

any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Stewart*, 543 U.S. at 494.

In *Mendez*, the Red Hawk spar was permanently attached to the sea floor, some five thousand feet down, and any attempt to move the structure would take nearly two months, cost $42 million dollars, require detaching the old moorings, and require building a completely new mooring system at the new site. Likewise, in order for Terral to move the work platform at issue here, an extensive process would also be required involving the use of two tug boats and five to six personnel.

The work platform on which Mr. Armand spent sixty to seventy percent of his time while working for Terral was permanently affixed not only to the Red River bottom, but also to the river bank. As was the "wharfboat" in *Evansville*, its primary purpose was to provide a working platform to unload the barges bringing fertilizer, rocks, and sand to the Terral facility. Therefore, we find that the work platform, "was not designed (to any practical degree) to serve a transportation function and did not do so," and does not qualify as a "vessel in navigation" for the purpose of allowing Mr. Armand to maintain his Jones Act Claim. *Lozman*, 133 S.Ct. at 743.

We find that the trial court correctly determined that the work platform was not a vessel. Nothing in the record before the trial court or this court raised a material issue of fact concerning the vessel status of the work platform. Mr. Armand's assignment of error is without merit.

**CONCLUSION**

For the foregoing reasons, the motion for summary judgment granted by the trial court in favor of Terral River Service Inc. is affirmed. All costs of this appeal are assessed to Albert Ross Armand.

10

**AFFIRMED.**