**RDI/CAESARS RIVERBOAT CASINO, INC., and M/V Glory of Rome, Appellants–Defendants,**

v.

**Tina CONDER, Appellee–Plaintiff.**

No. 31A04–0802–CV–40.

Court of Appeals of Indiana.

Nov. 25, 2008.

Gene F. Price, Frost Brown Todd LLC, New Albany, IN, Steven B. Belgrade, John A. O'Donnell, Belgrade and O'Donnell, PC, Chicago, IL, Attorneys for Appellants.

Karl Truman, Karl Truman Law Office, LLC, Jeffersonville, IN, Attorney for Appellee.

## OPINION

BAKER, Chief Judge.

Here, we must decide whether a riverboat casino that is indefinitely moored to the shore is a "vessel in navigation" for the purpose of the federal Jones Act.[1] We hold that it is not. Appellants-defendants RDI/Caesars Riverboat Casino, Inc., and the M/V Glory of Rome (collectively, Caesars) appeal the trial court's order granting appellee-plaintiff Tina Conder's motion for partial summary judgment and denying Caesars's motion to dismiss Conder's complaint. Caesars argues that the trial court erred as a matter of law by concluding that an indefinitely moored, dockside casino was a "vessel in navigation" pursuant to the Jones Act and that Conder was a Jones Act Seaman. Finding that the Jones Act does not apply, we reverse in part and remand with instructions to dismiss Conder's Jones Act claim and for further proceedings on her Sieracki seaman claim.

### FACTS

Caesars operates a casino (the Casino) on the riverboat M/V Glory of Rome (the Riverboat). The Riverboat is a passenger vessel that is registered with and regularly inspected by the U.S. Coast Guard. It has its own engines and machinery, as well as navigation, lifesaving, and fire-fighting equipment.

In August 2002, the Casino began exclusively conducting dockside gambling pursuant to amendments to Indiana state law that allowed casinos to stop cruising and conduct gaming while dockside. Since that time, the Riverboat has been moored and stationary with the exception of rare tests conducted in compliance with federal regulations. It is connected to the dock by eight mooring lines, two double-up lines, three fuel hoses, a sewage and water hose, and seven power cables. Since August 2002, the Riverboat has not transported passengers, cargo, or equipment.

Beginning in March 2002, Conder was employed as a table games dealer in the Casino. On August 19, 2003, and on subsequent occasions, Conder was repeatedly bitten by fleas during the course of her employment at the Casino. Treatment for her adverse reaction to the flea bites included large doses of steroids, which allegedly caused her to have a heart attack.

On April 26, 2005, Conder filed a complaint against Caesars, seeking compensation for her injuries based on the Jones Act or, in the alternative, pursuant to Indiana worker's compensation laws as a seaman pro hac vice—a Sieracki seaman. On March 26, 2007, Caesars filed a motion to dismiss the complaint pursuant to Indiana Trial Rule 12(B)(1).[2] On May 15, 2007, Conder filed a motion for partial summary judgment, seeking a declaration as a matter of law that she is a Jones Act

---

1. 46 U.S.C. § 688.

2. The motion to dismiss is not included in the record on appeal.

Seaman. The trial court held a hearing on the motion to dismiss and the motion for partial summary judgment on October 10, 2007, and on December 4, 2007, the trial court summarily denied Caesars's motion and granted Conder's motion. Caesars now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

#### A. Summary Judgment

In considering whether the trial court properly granted partial summary judgment in Conder's favor, we observe that summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning*, 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

#### B. Motion to Dismiss

In considering whether the trial court properly denied Caesars's motion to dismiss the complaint pursuant to Trial Rule 12(B)(1), we note that our review depends upon what occurred in the trial court. *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind.2001). Here, the trial court did not conduct an evidentiary hearing; instead, it relied on a "paper record." *Id.* Thus, we apply a de novo standard of review to the trial court's order. *Id.*

### II. The Jones Act

 The law has long recognized seamen as a special group of workers who are entitled to certain protections not afforded to their land-based counterparts:

> traditional seamen's remedies ... have been universally recognized as ... growing out of the status of the seaman and his peculiar relationship to the vessel, and as a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to sea in ships are subjected.

*McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 354, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). Among other benefits, workers who qualify as Jones Act Seamen may sue their employer directly in a civil action for negligence. 46 U.S.C. § 688. They may also sue their employer for a vessel's unseaworthiness. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 542, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

 The United States Supreme Court has established a two-prong test for determining whether an employee is a Jones Act Seaman. *Chandris v. Latsis*, 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). First, the employee must establish that she has a substantial employment-related connection to a "vessel in navigation[.]" *Id.* Second, the employee must establish that her duties contributed to the

function of the vessel or the accomplishment of its mission. *Id.* The Court explained that the "Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to 'the special hazards and disadvantages to which they who go down to sea in ships are subjected.'" *Id.* at 370, 115 S.Ct. 2172 (quoting *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 104, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) (Stone, C.J., dissenting)).

The primary issue in this appeal is whether the Riverboat is a "vessel in navigation" under the Jones Act. The United States Supreme Court's most recent exploration of the issue occurred in *Stewart v. Dutra Construction Company*, 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). The *Stewart* Court considered whether a floating dredge called the Super Scoop was a "vessel in navigation," describing its relevant characteristics as follows:

> The Super Scoop is a massive floating platform ... [and] has certain characteristics common to seagoing vessels, such as a captain and crew, navigational lights, ballast tanks, and a crew dining area. But it lacks others. Most conspicuously, the Super Scoop has only limited means of self-propulsion. It is moved long distances by tugboat.... It navigates short distances by manipulating its anchors and cables. When dredging the Boston Harbor trench, it typically moved in this way once every couple of hours, covering a distance of 30-to-50 feet each time.

*Id.* at 484–85, 125 S.Ct. 1118. The Court concluded that the term "vessel" " 'includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water.'" *Id.* at 489, 125 S.Ct. 1118 (quoting 1 U.S.C. § 3). And, more specifically, "a watercraft is not 'capable of being

used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 494, 125 S.Ct. 1118 (citing *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926) (finding that a wharfboat that was attached to the mainland by water, electricity, and telephone cables and was neither taken from place to place nor used to carry freight from one place to another was not a vessel in navigation)). The *Stewart* Court cautioned that a ship's status as a vessel—or as a non-vessel—is not something that changes frequently:

> A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again. See *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 570 (C.A.5 1995) (floating casino was no longer a vessel where it "was moored to the shore in a semipermanent or indefinite manner").....

*Id.* at 494, 125 S.Ct. 1118. Structures, however, "may lose their character as vessels if they have been withdrawn from the water for extended periods of time." *Id.* at 495, 125 S.Ct. 1118.

Turning back to the Super Scoop, the Court noted that the relevant statute "requires only that a watercraft be 'used or capable of being used, as a means of transportation on water' to qualify as a vessel. It does not require that a watercraft be used *primarily* for that purpose." *Id.* (emphasis in original). The Super Scoop "was not only 'capable of being used' to transport equipment and workers over wa-

ter—it was used to transport those things." *Id.* (emphasis in original). In sum,

> the "in navigation" requirement is an element of the vessel status of a watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation. A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one.... [T]he Super Scoop had not been taken out of service, permanently anchored, or otherwise rendered practically incapable of maritime transport.

*Id.* at 496, 125 S.Ct. 1118. Therefore, the Court concluded that the dredge was a "vessel in navigation" pursuant to the relevant statutory definition. *Id.* at 497, 125 S.Ct. 1118.

The Seventh Circuit Court of Appeals has explored this issue on at least two occasions. In *Howard v. Southern Illinois Riverboat Casino Cruises, Inc.,* the court considered whether an employee of an indefinitely moored riverboat casino was a Jones Act Seaman. 364 F.3d 854 (7th Cir.2004).[3] The riverboat in *Howard* ceased cruising along the Ohio River following a change in Illinois state law in 1999 and was permanently moored to the dock thereafter. *Id.* at 855. The casino did not transport passengers and was connected to land-based utilities, though it could be disconnected from the dock in fifteen to twenty minutes if needed. The riverboat was classified as a passenger vessel by the United States Coast Guard and employed a captain and crew qualified to move the casino if needed.

The Seventh Circuit focused on the same precedent as the United States Supreme Court later examined in *Stewart,* noting that past cases "did not hinge upon whether the vessel was ready and able to cruise, but looked to the vessel's purpose and actual use (whether it was used to move or transport anything)." *Id.* at 857 (citing *Pavone v. Mississippi Riverboat Amusement Corp.,* 52 F.3d 560, 570 (5th Cir.1995)). The *Howard* court ultimately concluded that "an indefinitely moored dockside casino with no transportation function or purpose" is not a vessel in navigation because "[r]ecognizing that indefinitely moored dockside casinos are not the kind of vessels that the Jones Act addresses is consistent with the statute's purpose of enhancing legal protections for seamen 'regularly' exposed to the 'perils of the sea.'" *Id.* at 857 (citing *Chandris,* 515 U.S. at 369, 115 S.Ct. 2172).

In 2006, the Seventh Circuit decided *Tagliere v. Harrah's Illinois Corporation,* which considered whether admiralty jurisdiction had been properly asserted over a lawsuit brought by a patron against a riverboat casino operator. 445 F.3d 1012 (7th Cir.2006). Although the central issue in *Tagliere* is distinct from the primary question at issue herein, some of the analysis is relevant to this appeal. In considering whether the riverboat casino was a "vessel" for the purpose of admiralty jurisdiction, the *Tagliere* court applied the *Stewart* rationale:

> while the Supreme Court has now held that a boat that "has been permanently moored or otherwise rendered practically incapable of transportation or move-

---

**3.** *Howard* was decided before *Stewart.* Although portions of the *Howard* analysis may now be in question in light of *Stewart,* much of the opinion is consistent with *Stewart* and there has been no suggestion that it has been overruled.

ment" is not a "vessel" for purposes of admiralty jurisdiction, *Stewart v. Dutra Construction Co.,* 543 U.S. 481, 494, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005), there has been no showing that the boat in our case, though stationary for the past two years, is *permanently* moored in the Court's sense (disabled from sailing) and is thus the equivalent of landfill.

*Id.* at 1013–14 (emphasis in original). Ultimately, the court held that the district court had erred in dismissing the suit for lack of jurisdiction,

> though it is open to the defendant to show on remand, if it can, that its boat was permanently rather than merely indefinitely moored when the accident occurred and was therefore no longer a "vessel" for purposes of admiralty jurisdiction. The difference between "permanently" and "indefinitely" in this context is vague and has not been explored by the parties. The *Stewart* case suggests that the boat must be permanently incapacitated from sailing. *Yet maybe— by analogy to the difference between domicile and residence—a boat also is "permanently" moored when its owner intends that the boat will never again sail, while if he has not yet decided its ultimate destiny it is only "indefinitely" moored.* These are matters for exploration on remand.

*Id.* at 1016 (emphasis added). Thus, although the Seventh Circuit did not provide a final answer to the question of how to determine the status of a moored riverboat casino, it suggested that the intent of the owner is a relevant factor to consider.

The United States District Courts of Indiana and Illinois have also had occasion to consider whether indefinitely moored riverboat casinos are vessels in navigation pursuant to the Jones Act. Without exception, these courts have concluded that the Jones Act does not apply. In *Earls v.*

*Belterra Resort, Indiana, LLC,* an employee of a riverboat casino sued her employer under the Jones Act for injuries she sustained on the job. 439 F.Supp.2d 884 (S.D.Ind.2006). The riverboat was indefinitely moored in 2002 following an amendment to Indiana state law. It was certified by the Coast Guard as a passenger vessel, had a full-time crew, steering controls, and navigational lights, and could be unmoored and cruising on the Ohio River within five minutes in an emergency situation and within forty-five minutes to an hour for a normal cruise. The riverboat had never applied for permanent mooring status. It was connected to a number of land-based utilities and the owner intended it to be used solely as an indefinitely moored casino.

The *Earls* court looked to *Howard* for guidance and concluded that, like the casino in *Howard,* "the 'Miss Belterra' is a vessel capable of cruising but it is not intended to be used to transport persons or cargo. It had not moved in over two and one-half years at the time of plaintiff's injury, and it has not moved since." *Id.* at 888. The court next examined *Stewart* and emphasized that the United States Supreme Court pointed out that structures "may lose their character as vessels if they have been withdrawn from the water for an extended period of time." *Id.* at 889. Ultimately, the *Earls* court held that the Miss Belterra was not a vessel in navigation:

> The "Miss Belterra," though theoretically capable of being in navigation, was intended to be taken out of navigation by its owner, and was made practically unable to navigate except in emergency situations at the time of the plaintiff's injuries. There is only a remote possibility it will sail again. The "Miss Belterra" was not a vessel in navigation at the time of the plaintiff's injuries.

Though vessels withdrawn from navigation can again be returned to navigation (and in the future the Jones Act could apply if the defendant decides to offer gambling "cruises" on the Ohio), the boat's status at the time of plaintiff's injury did not expose it's [sic] employees to the perils of the sea.

*Id.* at 890.

In *Ford v. Argosy Casino Lawrenceburg*, 2008 WL 817113 (S.D.Ind. Mar.24, 2008), the Southern District of Indiana considered the same issue—"whether a riverboat casino that is indefinitely moored to the shore is a 'vessel in navigation' for purposes of the federal Jones Act. The answer is no." *Id.* at * 1. As with the Miss Belterra, the Argosy was indefinitely moored and exclusively operated as a dockside casino beginning in 2002. The casino was not used to transport people or goods on the water and had no transportation function, though it had a full marine crew, was regularly inspected by the United States Coast Guard, was certified as seaworthy, and was capable of commencing navigation within several minutes if need be. After considering the relevant caselaw—including *Stewart, Howard,* and *Earls*—the court noted that the employee "has not come forward with evidence that would show that future sailing had become a 'practical possibility' instead of a 'theoretical one' when he was injured." *Id.* at *5. Therefore, the court found that the Jones Act did not apply and granted summary judgment in the casino's favor. *See also, e.g., De La Rosa v. St. Charles Gaming Co., Inc.,* 474 F.3d 185, 187 (5th Cir. 2006) (holding that indefinitely moored riverboat casino was not a vessel in navigation for purpose of admiralty jurisdiction because, although the riverboat "was still physically capable of sailing, such a use was merely theoretical," given that it was indefinitely moored to the land by lines tied to steel pilings, was connected to land-based utilities, had not been used as a seagoing vessel since 1991, and the owners did not intend to use it as such; therefore, "[i]ts operations are entirely gaming-related, and not maritime in nature"); *Martin v. Boyd Gaming Corp.,* 374 F.3d 375, 377 (5th Cir.2004) (holding that indefinitely moored riverboat casino was not a vessel in navigation under the Jones Act because "[t]he rule has never been 'once a vessel, always a vessel,' [so once the riverboat] was withdrawn from navigation so that transporting passengers, cargo or equipment on navigable water was no longer an important part of the business in which the craft was engaged the craft was not a vessel"); *Wire v. Showboat Marina Casino P'ship,* 2008 WL 818310, *6 (N.D.Ill. Mar.20, 2008) (holding that a permanently moored riverboat casino is not a vessel in navigation under the Jones Act, in part because the employee "failed to point to any evidence that shows that the Casino intends to ever move the Riverboat Casino from the dock and turn it again into a vessel in navigation"); *Watson v. Ind. Gaming Co., LP,* 337 F.Supp.2d 951, 955 (E.D.Ky.2004) (holding that an indefinitely moored riverboat casino is not a vessel in navigation under the Jones Act because the riverboat "has been indefinitely moored and is no longer used, nor intended to be used, for any river transportation function"). *Contra Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans,* 535 F.3d 1299, 1312 (11th Cir.2008) (holding that riverboat casino was a vessel for the purpose of interpreting a maritime contract giving rise to a maritime lien because the casino "maintained functioning machinery and was capable of moving under her own power ... all her crew would have had to do was unmoor her cables and start up her engine and the [riverboat] would have been able to sail[; f]urther, ... the [riverboat] was capable of moving over

water"); *Booten v. Argosy Gaming Co.,* 364 Ill.App.3d 697, 302 Ill.Dec. 141, 848 N.E.2d 141, 146 (2006) (holding that indefinitely moored casino was a vessel in navigation because the riverboat "is clearly capable of maritime transportation . . . [and] can be ready to cruise in approximately five to seven minutes if an emergency situation should arise").

In this case, the Riverboat has been moored and stationary since August 2002. It is connected to the land by eight mooring lines, two double-up lines, three fuel hoses, a sewage and water hose, and seven power cables. Since August 2002, the Riverboat has not transported passengers, cargo, or equipment. The Casino's Director of Marine Operations attested as follows:

> 5. The purpose of [the Riverboat] is no longer the transportation of passengers, cargo or equipment on the Ohio River, and has not been so since August 2002.
>
> 6. The [Riverboat] now serves as a platform on which to conduct gaming activities in order to comply with the requirements of Indiana state law concerning casino operations, and is indefinitely moored to its dock. With the exception of tests conducted in compliance with federal regulations, the [Riverboat] has been stationary since August 2002, and will remain indefinitely moored for the foreseeable future.

Appellants' App. p. 26.

Therefore, like the majority of cases in which a riverboat casino was found not to be a vessel in navigation, the Riverboat was theoretically capable of being in navigation but was intended to be removed from navigation and was practically unable to navigate except in emergency situations. *See, e.g., De La Rosa,* 474 F.3d 185 (observing that although the riverboat "was

still physically capable of sailing, such a use was merely theoretical"); *Ford,* 2008 WL 817113 at *5 (finding the Jones Act did not apply because the plaintiff failed to "come forward with evidence that would show that future sailing had become a 'practical possibility' instead of a 'theoretical one' when he was injured"); *Earls,* 439 F.Supp.2d at 890 (emphasizing that although the riverboat was "theoretically capable of being in navigation," it "was intended to be taken out of navigation by its owner, and was made practically unable to navigate except in emergency situations"). It is undisputed that since 2002, the Riverboat's operations have been entirely gaming-related, and not maritime in nature. In other words, the Riverboat is an indefinitely moored dockside casino with no transportation function or purpose. We agree with the Seventh Circuit that "indefinitely moored dockside casinos are not the kind of vessel that the Jones Act addresses[, given] . . . the statute's purpose of enhancing legal protections for seamen 'regularly exposed to the 'perils of the sea.'" *Howard,* 364 F.3d at 857 (citing *Chandris,* 515 U.S. at 369, 115 S.Ct. 2172).

Conder emphasizes that the Coast Guard has continued to inspect the Riverboat and that Caesars has not relinquished its Coast Guard Certificate of Inspection. Conder argues that this fact necessarily means that the Riverboat is a vessel in navigation under the Jones Act. We cannot agree, inasmuch as many other courts have considered indefinitely moored casinos that were registered with and inspected by the Coast Guard and concluded that they were not vessels in navigation under the Jones Act. *See, e.g., Martin,* 374 F.3d at 376; *Howard,* 364 F.3d at 856; *Ford,* 2008 WL 817113, at *2; *Earls,* 439 F.Supp.2d at 886; *Watson,* 337 F.Supp.2d at 954. *Cf. Soloman v. Blue Chip Casino, Inc.,* 772 N.E.2d 515, 520 (Ind.Ct.App.

2002) (holding that the mere fact of the Coast Guard's exercise of authority over a boat did not mandate a finding that the boat fell within Jones Act jurisdiction).

Conder also argues that Caesars's intent is irrelevant and that, in any event, the affidavit of the Director of Marine Operations is insufficient to support Caesars's argument. We acknowledge an apparent split between the Circuit Courts of Appeal on the issue of the relevance of the casino owner's intent to Jones Act applicability. The Fifth and Seventh Circuits have concluded that intent is relevant, while the Eleventh Circuit disagrees, finding intent to be beside the point. *Compare De La Rosa,* 474 F.3d at 187 (finding riverboat casino was not a vessel in navigation, in part because the casino owners' "intent was to use it solely as an indefinitely moored floating casino") *and Tagliere,* 445 F.3d at 1016 (observing that, perhaps, a boat is " 'permanently' moored when its owner intends that the boat will never again sail, while if he has not yet decided its ultimate destiny it is only 'indefinitely' moored") *with Belle of Orleans,* 535 F.3d at 1311 (concluding that courts should focus on whether the boat has been rendered practically incapable of transportation or movement rather than the shipowner's intent in determining Jones Act applicability).

We find the approach of the Fifth and Seventh Circuits to be the better one, inasmuch as it is evident that the shipowner's intent is part and parcel of the nature of the ship. If the owner intends to continue to transport passengers from time to time or to continue to take periodic cruises on the river, then that would weigh heavily in favor of a conclusion that the ship is a vessel in navigation. If, on the other hand, the owner intends that the ship be moored indefinitely and that it will never sail again, then that militates in favor of a conclusion that the Jones Act does not apply. While perhaps not dispositive, we believe that the owner's intent is, at least, relevant to the analysis.

Here, it is undisputed that Caesars intended that the Riverboat be moored indefinitely and remain stationary for the foreseeable future. Appellant's App. p. 26. Conder argues that the affidavit of the Director of Marine Operations is insufficient, inasmuch as it merely consists of a series of self-serving statements. Initially, we note that an affidavit supporting or opposing summary judgment is acceptable so long as it is "made on personal knowledge, ... set[s] forth such facts as would be admissible in evidence, and ... show[s] affirmatively that the affiant is competent to testify to the matters stated therein." Ind. Trial Rule 56(E). Here, there has been no suggestion that Caesars's affidavit does not meet those requirements.

Furthermore, we note that, in considering Jones Act applicability, courts have routinely relied on similar affidavits. *See, e.g., Wire,* 2008 WL 818310, at *7 (noting that "nothing prohibits the Casino from presenting [an] affidavit as support for its contention concerning the intent of the Casino.... The Casino is merely required to present admissible evidence."); *Watson,* 337 F.Supp. N.E.2d at 954 (holding that "[w]hile plaintiff argues that the affidavit of Argosy's manager, who states that the casino has no intention of moving the riverboat on a regular basis in the future, is 'suspect,' plaintiff presents no evidence to cast doubt on her testimony"). Here, likewise, Conder has presented no evidence disputing or casting doubt on the testimony of the Director of Marine Operations regarding Caesars's intent for the Riverboat's operation. Thus, it is undisputed that Caesars does not intend to resume the Riverboat's maritime operations in the foreseeable future.

In sum, the Riverboat has been moored to the dock since 2002. It has had no transportation function since that time. It is joined to the land by a number of cables. It is connected to land-based utilities. Its owners intend that it remain stationary for the foreseeable future. Thus, the Riverboat's operations are gaming-related, rather than maritime in nature, and that has been the case since 2002. Conder, as a table games dealer for the Casino, is simply not an employee who is regularly—or at all—exposed to "the special hazards and disadvantages to which they who go down to sea in ships are subjected." *McDermott*, 498 U.S. at 354, 111 S.Ct. 807. Under these circumstances, we cannot conclude that the Riverboat is a vessel in navigation or that Conder is the type of employee that the Jones Act is intended to cover and protect. We find, therefore, that the trial court erred as a matter of law by granting Conder's motion for partial summary judgment and denying Caesars's motion to dismiss the Jones Act count of Conder's complaint.[4]

The judgment of the trial court is reversed in part and remanded with instructions to dismiss Conder's Jones Act claim with prejudice and for further proceedings on her Sieracki seaman claim.

MATHIAS, J., and BROWN, J., concur.

[4]. Conder included a second, alternative, count in her complaint, seeking relief as a seaman pro hac vice—a Sieracki seaman. We infer from the pleadings in the appendices that the Casino included this count in its motion to dismiss. The Casino, however, has not appealed the trial court's order denying its motion to dismiss with regard to the Sieracki seaman count. Indeed, neither party addresses this issue on appeal. Consequently, we remand for further proceedings on this claim.