# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60634

United States Court of Appeals
Fifth Circuit

**FILED**

August 19, 2016

Lyle W. Cayce
Clerk

JAMES BAKER, JR.,

      Petitioner

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; GULF ISLAND MARINE FABRICATORS, L.L.C.,

      Respondents

---

Petition for Review of an Order
of the Benefits Review Board

---

Before REAVLEY, HAYNES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Petitioner James Baker appeals the Benefits Review Board's decision affirming the denial of benefits under the Longshore and Harbor Workers' Compensation Act and the Outer Continental Shelf Lands Act. We affirm.

## I. Background

James Baker worked as a marine carpenter for eight months at Gulf Island Marine Fabricators, L.L.C.'s waterside marine fabrication yard in

No. 15-60634

Houma, Louisiana. He was allegedly injured[1] while building a housing module designed for use on a tension leg offshore oil platform (TLP) named Big Foot. Baker filed a claim for disability benefits under the Longshore and Harbor Workers' Compensation Act (LHWCA), arguing that he is covered by the LHWCA directly as a shipbuilder and, alternatively, is covered under the LHWCA as extended by the Outer Continental Shelf Lands Act (OCSLA).

Big Foot, like other TLPs, is a type of offshore oil platform used for deep water drilling; the parties concede that Big Foot was not built to regularly transport goods or people. Its various parts were constructed in several locations: its base, which is capable of flotation, was built in Korea; its operations modules were built in Aransas Pass, Texas; and its living quarters were built in Houma, Louisiana. All of these components were transported to Ingleside, Texas for assembly—a process that often takes several months, if not years. Although Big Foot can float, it is not capable of self-propulsion, has no steering mechanism, does not have a raked bow, and has no thrusters for positioning once on location. Once completed, Big Foot was scheduled to be towed to a location approximately two hundred miles off the coast of Louisiana and anchored to the sea floor by over sixteen miles of tendons.[2] Anytime it is under tow, Big Foot will be tended to by a crew that is employed to control Big Foot during the voyage. Once anchored, Big Foot will serve as a work platform for the life of the oil field, which is estimated to be twenty years. The U.S. Coast Guard classified Big Foot as a "Floating Outer Continental Shelf [OCS]

---

[1] The parties stipulated that if Baker suffered an injury, it took place within the scope of his employment for Gulf Island. However, the parties did not stipulate that Baker actually *suffered* an injury.

[2] According to the Office of Workers' Compensation, Big Foot was completed and towed to the Outer Continental Shelf in early 2015. Once on site, however, the tendons designed to secure the rig to the seabed malfunctioned, requiring Big Foot to be towed back to Texas.

No. 15-60634

Facility" pursuant to 33 C.F.R. § 143.120, and stated in an email that, as a "non self-propelled vessel," it must be towed to its resting spot on the OCS.

An Administrative Law Judge (ALJ) held a formal hearing on Baker's disability claims; afterwards, he issued a decision and order denying benefits. The ALJ determined that Baker was not covered by the LHWCA because he was not engaged in maritime employment as a shipbuilder, based on his determination that Big Foot is not a "vessel" under the LHWCA. The ALJ next denied Baker's claim for coverage under the OCSLA, concluding that there was no significant causal link between Baker's alleged injury and operations on the OCS. Baker appealed the ALJ's decision to the Benefits Review Board (BRB), which affirmed the ALJ's decision. Baker timely filed with this court a petition for review.

## II. Discussion

### A.

The BRB must uphold the ALJ's factual findings if they are supported by substantial evidence. 33 U.S.C. § 921(b)(3). "Substantial evidence is that relevant evidence—more than a scintilla but less than a preponderance—that would cause a reasonable person to accept the fact finding." *Coastal Prod. Servs. Inc. v. Hudson*, 555 F.3d 426, 430 (5th Cir. 2009). This court reviews the BRB's legal determinations de novo, *id.*, and "afford[s] deference to interpretations of the LHWCA by the Director of the Office of Workers' Compensation Programs," *B & D Contracting v. Pearley*, 548 F.3d 338, 340 (5th Cir. 2008). Where the facts are not in dispute—as in this case—whether LHWCA coverage exists is a question of statutory interpretation and thus is reviewed as a pure question of law. *New Orleans Depot Servs., Inc. v. Dir., Office of Workers' Comp. Programs*, 718 F.3d 384, 387 (5th Cir. 2013) (en banc).

No. 15-60634

B.

Baker first alleges that that he met the requirements for coverage under the LHWCA, which establishes a federal workers' compensation scheme for maritime workers. Prior to 1972, the Act only covered injuries occurring on navigable waters, but Congress has since broadened the LHWCA's coverage to extend to maritime activities occurring on land near the water. *See Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 46 (1989). To be eligible for benefits under the LHWCA, a claimant must show that his injury occurred on a maritime situs (the situs requirement), and that he is a maritime employee (the status requirement). *Hudson*, 555 F.3d at 431 (citing 33 U.S.C. §§ 902(3), 903(a)). The parties stipulate that Baker meets the situs requirement—the only question is whether Baker meets the status requirement. To meet the status requirement, Baker must be an "employee" as defined by 33 U.S.C. § 902(3); namely, Baker must be "engaged in maritime employment," which includes "ship repairman, shipbuilder, and ship-breaker." The Supreme Court has added that any other occupation that "entails activities that are an integral or essential part of the loading, unloading, building, or repairing of a vessel" also makes one an employee for purposes of the LHWCA. *Hudson*, 555 F.3d at 439 (emphasis omitted) (citing *Schwalb*, 493 U.S. at 47). Baker was injured while working on modules destined for Big Foot; thus, Baker's entitlement to benefits under the LHWCA turns on whether Big Foot is a vessel as contemplated by the Act. The ALJ and BRB both concluded that Big Foot is not a vessel, and we agree.

The LHWCA does not meaningfully define the term "vessel," so the Supreme Court incorporated the definition provided in the Rules of Construction Act, 1 U.S.C. § 3. *See Stewart v. Dutra Const. Co.*, 543 U.S. 481, 488–90 (2005). "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of

4

transportation on water." 1 U.S.C. § 3. Twice in the last eleven years the Supreme Court has wrestled with whether a particular watercraft qualifies as a vessel as defined by § 3. The first case dealt with a floating dredge known as the *Super Scoop*—"a massive floating platform from which a clamshell bucket [was] suspended beneath the water. The bucket remove[d] silt from the ocean floor and dump[ed] the sediment onto one of two scows that float[ed] alongside the dredge." *Dutra*, 543 U.S. at 484. The *Super Scoop* was used extensively as part of Boston's infamous Big Dig, and had "characteristics common to seagoing vessels, such as a captain and crew, navigational lights, ballast tanks, and a crew dining area." *Id.* However, it only had "limited means of self-propulsion" and was "moved long distances by tugboat." *Id.*

In concluding that the *Super Scoop was* a vessel for the purposes of the LHWCA, the Supreme Court noted that § 3 "requires only that a watercraft be 'used, or capable of being used, as a means of transportation on water' to qualify as a vessel." *Id.* at 495 (quoting 1 U.S.C. § 3). Given that "[§3] does not require that a watercraft be used *primarily* for that purpose," the Court held that the *Super Scoop* met the definition of a vessel because its "function was to move through Boston Harbor, . . . digging the ocean bottom as it moved," which required the *Super Scoop* to "carr[y] machinery, equipment, and a crew over water." *Id.* at 495, 492. The Court concluded that "the *Super Scoop* was not only 'capable of being used' to transport equipment and workers over water—it *was* used to transport those things. Indeed, it could not have dug the Ted Williams Tunnel had it been unable to traverse the Boston Harbor, carrying with it workers like Stewart." *Id.* at 495.

The Supreme Court revisited the question of what qualifies as a vessel eight years later in *Lozman v. City of Riviera Beach*, 133 S. Ct. 735 (2013). In *Lozman*, the Court considered whether a "floating home" was a vessel under

§ 3.[3] The Court once again focused on the language of § 3, but made clear that "[n]ot *every* floating structure is a 'vessel.' . . . even if they are 'artificial contrivance[s]' capable of floating, moving under tow, and incidentally carrying even a fair-sized item or two when they do so." *Id.* at 740 (second emphasis in original). The Court then concluded that Lozman's house boat was *not* a vessel because, "[b]ut for the fact that it floats, nothing about Lozman's home suggests that it was designed to any practical degree to transport persons or things over water." *Id.* at 741. This distinguished the house boat from the *Super Scoop*, which the Court noted "was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water." *Id.* at 743. The house boat, on the other hand, was not regularly used to transport people or goods over water:  it "had no rudder or other steering mechanism . . . [i]ts hull was unraked . . . it had a rectangular bottom 10 inches below the water . . . [i]t had no special capacity to generate or store electricity . . . [and i]ts small rooms looked like ordinary nonmaritime living quarters." *Id.* Finally, the Supreme Court noted that while a "lack of self-propulsion is not dispositive, it may be a relevant physical characteristic." *Id.* (citation omitted). Lozman's house boat had no self-propulsion—it "was able to travel over water only by being towed. Prior to its arrest, that home's travel by tow over water took place on only four occasions over a period of seven years." *Id.*

Returning to our case, we conclude that Big Foot is *not* a vessel. Like the floating home in *Lozman*, Big Foot has no means of self-propulsion, has no steering mechanism or rudder, and has an unraked bow. Big Foot can only be moved by being towed through the water, and when towed to its permanent

---

[3] Unlike *Dutra*, *Lozman* was not a case brought under the LHWCA. Rather, *Lozman* asked whether the district court had admiralty jurisdiction to consider a suit seeking a federal maritime lien on a floating home under the Federal Maritime Lien Act, 46 U.S.C. § 31342. 133 S. Ct. at 739. The question of admiralty jurisdiction, however, turned on whether the floating home was a vessel under 1 U.S.C. § 3.

location, Big Foot will not carry "items being transported from place to place (*e.g.*, cargo)," but only "mere appurtenances." *Id.* at 745. While required to carry a captain and crew when towed, the crew will only be present to ensure Big Foot's transport to its permanent location on the OCS. And unlike the *Super Scoop*, Big Foot will not be used to transport equipment and workers over water in the course of its regular use. *Dutra*, 543 U.S. at 495. In fact, Big Foot is only intended to travel over water once in the next twenty years—the voyage to its operational location on the OCS. Given these undisputed facts, "a reasonable observer, looking to [Big Foot's] physical characteristics and activities, would [not] consider it designed to a practical degree for carrying people or things over water." *Lozman*, 133 S. Ct. at 741.

Our conclusion that Big Foot is not a vessel under the LHWCA likewise comports with our precedent. In *Bernard v. Binnings Constr. Co., Inc.*, 741 F.2d 824 (5th Cir. 1984), we held that a work punt was not a vessel under the Jones Act[4] because, even though the work punt was frequently moved around a work site, it functioned as a work platform and was not designed for or engaged in the business of navigation. *Id.* at 830. We concluded that "[t]he work punt lacks all indicia of a structure designed for navigation; it has no raked bow, no means of self-propulsion, and no crew quarters or navigational lights." *Id.* at 832. Big Foot likewise was not designed for transportation or navigation—it has no means of self-propulsion, no steering mechanism, and no raked bow; further, Big Foot will not transport objects from place to place, and is intended to remain anchored to the floor of the OCS for twenty years. In *Smith v. Massman Const. Co.*, 607 F.2d 87 (5th Cir. 1979), also a Jones Act case, we likewise concluded that a caisson was

---

[4] For purposes of the Jones Act, a vessel is defined as a "structure[] designed or utilized for 'transportation of passengers, cargo or equipment from place to place across navigable waters.'" *Binnings*, 741 F.2d at 828–29. While phrased slightly different from 1 U.S.C. § 3's definition of a vessel ("The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."), we are comforted by the fact that our holding today fits well with our Jones Act cases.

not a vessel in large part because the caisson's "transportation of men and material, if any occurred, was incidental" to its purpose of "being both a form for concrete in a bridge pier and a part of the pier itself, not for the purpose of being a . . . vessel." *Id.* at 89. The fact that Big Foot will transport a crew and material to the OCS is likewise incidental to its purpose of serving as an oil field work platform. *See also Blanchard v. Engine & Gas Compressor Servs., Inc.*, 575 F.2d 1140, 1141–43 (5th Cir. 1978) (concluding in a Jones Act case that "buildings mounted on virtually permanently sunken barges [were] not Jones Act vessels," and noting that "(m)ere flotation on water does not constitute a structure a 'vessel'" (alteration in original) (quoting *Cook v. Belden Concrete Prods., Inc.*, 472 F.2d 999, 1001 (5th Cir. 1973))); *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 752 (5th Cir. 2014) (concluding that a floating oil and gas production facility moored to the floor of the OCS was not a vessel under 1 U.S.C. § 3 because it was "not practically capable of transportation on water").

## C.

Baker also challenges the ALJ's determination that his activities as an employee of Gulf Island did not have a sufficiently substantial nexus to OCS operations such that he is entitled to compensation under the LHWCA as extended by the OCSLA. The OCSLA extends coverage of the LHWCA to "injur[ies] occurring as the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources . . . of the outer Continental Shelf." 43 U.S.C. § 1333(3)(b). Baker argues that he was injured "as the result of operations" on the OCS because he was injured while constructing living quarters, which would ultimately be integrated into Big Foot, which would ultimately be placed on the OCS.

No. 15-60634

The Supreme Court recently clarified that a "'claimant must establish a substantial nexus between the injury and extractive operations on the [OCS]' to qualify for workers' compensation benefits under the OCSLA." *Pac. Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 685 (2012) (quoting *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1139 (9th Cir. 2010).[5] To meet the substantial nexus test, "the injured employee [must] establish a significant causal link between the injury that he suffered and his employer's on-OCS operations conducted for the purpose of extracting natural resources from the OCS." *Id*. at 691. Baker's injury—incurred on dry land while "building the living and dining quarters for [Big Foot]"—does not satisfy this fact-specific test.

In rejecting the Third Circuit's "but for" test, the Supreme Court was clear in *Valladolid* that the OCSLA was not meant to "cover land-based office employees whose jobs have virtually nothing to do with extractive operations on the OCS." *Id*. at 690. Rather, the Supreme Court acknowledged that "whether an employee injured while performing an off-OCS task qualifies . . . is a question that will depend on the individual circumstances of each case." *Id*. at 691. While not an office employee, Baker's job of constructing living and dining quarters is too attenuated from Big Foot's future purpose of extracting natural resources from the OCS for the OCSLA to cover his injury. Baker's employment was located solely on land, whereas, for example, the deceased in *Valladolid* spent ninety-eight percent of his time on an offshore drilling platform (even though he was injured while on land). *Id*. at 684. Baker's particular job, to the contrary, did not require him to travel to the OCS *at all*, making his work geographically distant from the OCS. And although Gulf

---

[5] In adopting this "substantial nexus" test, the Supreme Court rejected this court's "situs-of-injury" test. *Valladolid*, 132 S. Ct. at 685, 687.

No. 15-60634

Island manufactured the living quarters for Big Foot, the company had no role in moving Big Foot to, installing Big Foot on, or operating Big Foot once placed on the OCS. Based on the specific facts of Baker's employment, we conclude that his injury does not satisfy the substantial nexus test and is not covered under the LHWCA as extended by the OCSLA.

## III. Conclusion

For the aforementioned reasons, we AFFIRM.