REVISED AUGUST 4, 2020

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 3, 2020

Lyle W. Cayce
Clerk

No. 19-30535

Peggy Mays, Individually & as Personal Representative, *on behalf of* James L. Mays Estate; Daphne Lanclos; Brent Mays; Jared Mays,

*Plaintiffs—Appellees*,

*versus*

Chevron Pipe Line Company,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:14-CV-3098

Before Barksdale, Higginson, and Duncan, *Circuit Judges*.

Stuart Kyle Duncan, *Circuit Judge*:

James Mays was killed in an explosion on an offshore platform owned by appellant Chevron Pipe Line Company ("Chevron"). Mays was directly employed by a Chevron subcontractor, Furmanite American ("Furmanite"), which serviced valves on Chevron's platforms. Mays' widow and children sued Chevron for state-law wrongful death, and Chevron

claimed immunity under the state workers' compensation scheme. The parties agree that state immunity does not protect Chevron if Mays' accident was covered by the federal Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–50, which extends to injuries "occurring as the result of" natural-resource extraction on the Outer Continental Shelf ("OCS"). 43 U.S.C. § 1333(b). This question of LHWCA coverage was submitted to the jury, based on evidence that even though the platform Mays was working on was in Louisiana waters, it was connected to Chevron's OCS platforms; that the fatal explosion was caused by gas flowing from those platforms; and that those platforms had to be shut down due to the accident. The jury found Mays' death was caused by Chevron's OCS activities, which meant that the LHWCA applied and that Chevron did not enjoy state immunity. The jury found Chevron 70% at fault for Mays' death and awarded his widow $2 million for her loss of Mays' affection.

Chevron's central argument on appeal concerns the jury instructions. Chevron insists they violated the Supreme Court's decision in *Pacific Operators Offshore, LLP v. Valladolid*, which interpreted the federal law extending LHWCA coverage to OCS activities. 565 U.S. 207 (2012). Chevron argues that under *Valladolid*, the jury should have been asked only whether the OCS activities of Mays' *direct* employer, Furmanite, caused his death. According to Chevron, Furmanite had no OCS activities, and so the LHWCA could not have applied to supplant Chevron's state immunity. Asking instead about the link between Mays' death and *Chevron's* OCS operations, Chevron urges, was legal error that requires reversing the jury verdict and rendering judgment in Chevron's favor.

Chevron misreads *Valladolid*. That decision, consistent with the language of the statute it interpreted, requires only a link "between the injury and extractive operations on the shelf." *Id.* at 211. It does not specify which

employer's OCS operations are relevant in a case, like this one, where a subcontractor's employee does work for a contractor with OCS operations. Chevron would extract from *Valladolid* a limitation it does not contain. We therefore reject Chevron's argument that the jury instructions violated *Valladolid*. We also reject Chevron's alternative arguments that the evidence failed to link Mays' death with Chevron's OCS operations and that the district court abused its discretion in not reducing Mrs. Mays' damages.

The judgment of the district court is affirmed.

## I.

James Mays worked as a valve technician for Furmanite. On September 13, 2014, Mays was killed while servicing a valve at the Lighthouse Point natural gas platform, which is part of Chevron's Henry Gas Gathering System ("Henry System"). The platform lies in Louisiana's territorial waters, but the Henry System includes other platforms outside Louisiana waters on the OCS.[1] Two such platforms are connected by pipeline to the platform on which Mays was killed. To stop the gas flowing through the breached valve that caused Mays' death, Chevron had to shut off gas flow from the two connected OCS platforms. At the time of the accident, Mays was working pursuant to a contract between Chevron and Furmanite, under which Furmanite provided maintenance and repair services to several Henry System platforms.

Mays' estate, wife, and children (collectively, "plaintiffs") sued Chevron in federal district court, invoking the court's diversity jurisdiction

---

[1] The OCS comprises "all submerged lands lying seaward" of state-controlled navigable waters but within the United States' exclusive economic zone. 43 U.S.C. § 1331(a); *see also id.* § 1301(a).

and raising tort claims under Louisiana law. Specifically, they alleged Chevron failed to maintain the valve Mays was working on and also misinformed him about the valve's manufacturer. They asserted these mistakes led Mays to inadvertently breach the pipeline's pressure barrier, triggering an explosion that killed him.

Chevron moved for summary judgment, claiming immunity as Mays' "statutory employer" under the Louisiana Workers' Compensation Act ("LWCA"), LA. REV. STAT. ANN. §§ 23:1020–1470. A statutory employer is one that receives work from someone by contracting with his direct employer. *See id.* § 23:1061(A)(1). The statutory employer may owe the employee workers' compensation under certain circumstances. In exchange, the statutory employer, like the direct employer, is immune from tort liability. *Id.*; *see also id.* § 23:1032(A)(1).

In response, the plaintiffs argued this state-law immunity did not apply because Mays was covered by the federal LHWCA. By its terms, the state LWCA does not apply where the LHWCA does.[2] The plaintiffs argued the LHWCA applied to Mays' death because of the accident's ties to the OCS. Another federal law, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–56, extends the LHWCA to injuries "occurring as the result of" OCS operations. 43 U.S.C. § 1333(b). This extension applies where (1) an employee's injury "result[s] from" OCS extractive operations, and (2) his employer is an "employer" under

---

[2] *See* LA. REV. STAT. ANN. § 23:1035.2 (providing that "[n]o [LWCA] compensation shall be payable" to employees "covered by . . . the [LHWCA], or any of its extensions"); *see also, e.g.*, *Johnson v. ACE Am. Ins. Co.*, 2015-0277 (La. App. 4 Cir. 9/23/15), 176 So. 3d 609, 610–11 (explaining LWCA is inapplicable "if [employee] is eligible to receive benefits under the LHWCA or other federal compensation scheme").

No. 19-30535

OCSLA.[3] *See Barger v. Petroleum Helicopters, Inc.*, 692 F.2d 337, 340 (5th Cir. 1982); *Stansbury v. Sikorski Aircraft*, 681 F.2d 948, 950 (5th Cir. 1982).[4] An injury "result[s] from" OCS extractive operations if it has a "substantial nexus" to those operations. *Valladolid*, 565 U.S. at 222. Chevron responded that it was not Mays' "employer" under OCSLA and that Mays' death could have had no nexus to OCS operations because his direct employer, Furmanite, had no such operations.

The district court initially agreed with Chevron and granted summary judgment. It ruled that whoever the relevant employer might be under OCSLA (Chevron or Furmanite), the plaintiffs failed to identify any evidence showing a "substantial nexus" between Chevron's OCS operations and Mays' death. On the plaintiffs' motion to alter or amend the judgment, however, the court changed its mind. It found a genuine dispute of material fact as to the substantial-nexus requirement because, contrary to its prior understanding, the incident involved "gas being transported by pipeline from the [OCS]" and caused Chevron to shut down two OCS platforms. The court denied Chevron's motion to certify that ruling for interlocutory appeal.

---

[3] An "employer" under OCSLA is

> an employer any of whose employees are employed in . . . operations conducted on the [OCS] for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the [OCS].

43 U.S.C. § 1333(b)(2).

[4] Ordinarily, to qualify for LHWCA coverage, an employee must meet maritime "situs" and "status" tests. *See* 33 U.S.C. §§ 903(a), 902(3); *see also generally Wood Grp. Prod. Servs. v. Malta*, 930 F.3d 733, 737, 743 (5th Cir. 2019) (discussing situs and status). Because OCSLA has its own status test, however, "there is no need for an employee to whom OCSLA applies to satisfy independently the two-fold situs and status test for LHWCA coverage." *Stansbury*, 681 F.2d at 950–51.

The case proceeded to trial before a different district judge.[5] At the close of the plaintiffs' case and again at the close of evidence, Chevron moved for judgment as a matter of law ("JMOL"), relying on its contention that there was no connection between Mays' death and any OCS operations of Furmanite. The motions were denied, and the jury was instructed to determine whether there was a substantial nexus between Mays' death and Chevron's OCS operations. The jury found there was. It assigned 70% of the fault for Mays' death to Chevron and 30% to Mays, and awarded damages of over $2.9 million, including $2 million to Mrs. Mays for loss of affection. The district court denied Chevron's renewed motion for JMOL. Chevron also moved for remittitur of the $2 million awarded to Mrs. Mays. The district court sustained all but $527.54 of the award and entered an amended judgment. Chevron timely appealed.

## II.

We review a district court's ruling on a renewed JMOL motion *de novo*, applying the same standards as the district court. *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019) (quoting *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 473 (5th Cir. 2018)). A party is entitled to JMOL when "[the] party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). We examine the evidence as a whole and "in the light most favorable to the non-moving party." *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018) (quoting *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 854 (5th Cir. 2010)). A jury verdict lacks a legally sufficient

---

[5] The original judge retired.

evidentiary basis "where the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict." *Id.* "[T]he court may not make credibility determinations or weigh the evidence, as those are jury functions." *N. Cypress Med. Ctr.*, 898 F.3d at 473 (quoting *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016)). "Where a jury verdict has been rendered, . . . we are 'especially deferential' to the verdict." *MultiPlan*, 937 F.3d at 494 (quoting *Johnson v. Thibodaux City*, 887 F.3d 726, 731 (5th Cir. 2018)).

We review the district court's ruling on a remittitur motion for abuse of discretion. *Longoria v. Hunter*, 932 F.3d 360, 364 (5th Cir. 2019); *Esposito v. Davis*, 47 F.3d 164, 167 (5th Cir. 1995).

### III.

Chevron raises three issues on appeal. First, it claims the district court misapplied the Supreme Court's *Valladolid* decision by instructing the jury to determine whether there was a substantial nexus between Mays' death and *Chevron's*—as opposed to *Furmanite's*—OCS operations. Second, even assuming the focus was correctly on Chevron's OCS operations, Chevron argues the link between those operations and Mays' death was so "indirect" and "tenuous" that it failed the substantial nexus test as a matter of law. Third, Chevron argues the district court abused its discretion by refusing to reduce Mrs. Mays' $2 million because the facts were not "especially tragic" compared to other cases and supported at most a $700,000 award. We address each issue in turn.

No. 19-30535

**A.**

Chevron first argues the district court erred in instructing the jury to focus on the connection between its own OCS operations and the accident.[6] Instead, it claims, the jury should have been instructed to consider the nexus between Mays' death and Furmanite's operations. Because Furmanite had no OCS operations, Chevron argues, it was entitled to JMOL. Chevron's argument turns on what it calls the "plain language" of the Supreme Court's "holding" in *Valladolid*, and so we examine that decision in some detail.

*Valladolid* resolved a circuit split over the causation standard in 43 U.S.C. § 1333(b), the OCSLA provision that extends LHWCA coverage to OCS extraction–related injuries. The provision applies the LHWCA to injuries "occurring as the result of operations conducted on the [OCS]." *Id.* Our circuit had held this language established a narrow "situs-of-injury" test, covering injuries on an OCS platform or on waters above the OCS. *Mills v. McDermott, Inc.*, 877 F.2d 356, 362 (5th Cir. 1989) (en banc). By contrast, the Third Circuit had read the same language to establish a broader test covering any injuries that would not have occurred "but for" OCS operations. *See Curtis v. Schlumberger Offshore Serv., Inc.*, 849 F.2d 805, 811 (3d Cir. 1988). In *Valladolid*, the Supreme Court rejected both formulas in favor of the Ninth Circuit's middle-ground test, which required a "substantial nexus between the injury and extractive operations on the shelf." 565 U.S. at 211 (quoting *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1139 (9th Cir.

---

[6] As noted, the reason for asking this jury question was to determine whether Mays was covered by OCSLA's extension of the LHWCA to OCS-related injuries. 43 U.S.C. § 1333(b). The parties agree that if the LHWCA applies to Mays via OCSLA, Chevron cannot benefit from the Louisiana statutory-employer defense.

2010)); *see id*. at 222 (concluding "the Ninth Circuit's 'substantial-nexus' test is more faithful to the text of § 1333(b)'").

As it did in the district court, Chevron insists that *Valladolid*'s "plain language" resolves the question here—namely which employer's OCS activities inform the substantial nexus test when a case involves a subcontractor (*i.e.*, a "direct" employer) and a contractor (an "indirect" employer). Chevron focuses on *Valladolid*'s statement that the test requires "a significant causal link between the injury that [the employee] suffered and *his employer's* on-OCS operations." 565 U.S. at 222 (emphasis added). In Chevron's view, this language means that the only relevant employer is the "direct, payroll employer."

But *Valladolid* does not stand for that proposition. As the district court explained in rejecting this argument, *Valladolid* involved only a benefits claim against a direct employer. *See id.* at 210. The decision did not involve the situation where a subcontractor's employee claims benefits vis-à-vis a contractor, and so had no occasion to explore how the nexus test would apply there. Moreover, as discussed, *Valladolid* asked only what causation standard to extract from § 1333(b); it did not address who may qualify as an "employer" under OCSLA. Chevron's fixation on the phrase "his employer" in *Valladolid* thus commits two errors. First, it extends a judicial decision beyond its holding, parsing the opinion as if it were a statute. *See, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) ("[T]he language of an opinion is not always to be parsed as though we were dealing with the language of a statute."). Second, Chevron overlooks that *Valladolid* phrased the test elsewhere in the opinion without mentioning a "employer" at all. *See* 565 U.S. at 211 (asking whether "'the claimant must establish a substantial nexus between the injury and extractive operations on the shelf' to qualify for workers' compensation benefits under the OCSLA" (quoting *Valladolid*, 604

F.3d at 1139)); *id.* at 216–17 (stating "§ 1333(b) extends LHWCA workers' compensation coverage to any employee injury, regardless of where it happens, as long as it occurs 'as the result of operations conducted on the [OCS]").[7]

Chevron also relies on our post-*Valladolid* decision in *Baker v. Gulf Island Marine Fabricators, L.L.C.*, 834 F.3d 542 (5th Cir. 2016), but only because it quotes Chevron's preferred "his employer" phrase from *Valladolid. See id.* at 548 (quoting *Valladolid*, 565 U.S. at 222). Like *Valladolid*, *Baker* involved only claims against a direct employer. *See id.* at 544 & n.1. And, like *Valladolid*, *Baker* at times phrased the nexus test without referring to the claimant's "employer." *See id.* at 548 (asking whether Baker's activities had "a sufficiently substantial nexus to OCS operations"). Even worse for Chevron, in applying the nexus test, *Baker* did not limit itself to asking about the direct employer's OCS operations but also considered the operations of the platform the employee was working on. *See id.* at 549 (asking whether employee's work was "too attenuated from [the platform's] future purpose of extracting natural resources from the OCS for the OCSLA to cover his injury").[8]

---

[7] Justice Scalia's concurrence—which advanced a "proximate cause" formulation—did the same. *See id.* at 223 (Scalia, J., concurring in part and concurring in the judgment) ("I would hold that an employee may recover under § 1333(b) if his injury was proximately caused by operations on the [OCS]."). These alternative formulations underscore that Chevron's argument is, at bottom, an attempt to construct a holding out of one out-of-context phrase from *Valladolid*.

[8] The employee in *Baker*, whose direct employer was Gulf Island, was working on a "tension leg offshore oil platform (TLP) named Big Foot," *id.* at 544, co-owned by Chevron and other companies, *see Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 511 (5th Cir. 2019). In concluding there was no substantial nexus, *Baker* looked to the OCS contacts of both Gulf Island and the platform owners. *See* 834 F.3d at 549 (discussing Big Foot's OCS operations as well as Gulf Island's lack of OCS operations). *Baker* did not

No. 19-30535

We find more guidance on this issue from the language of § 1333(b). That provision requires a link only between the employee's "injury" and extractive "operations conducted on the [OCS]." *See* 43 U.S.C. § 1333(b) (applying LHWCA "[w]ith respect to disability or death of an employee resulting from any injury occurring as the result of operations conducted on the [OCS]"). It does not restrict the relevant operations to those conducted by the employee's "direct, payroll employer," as Chevron claims. Given that OCSLA and the LHWCA contain numerous, express references to an "employer,"[9] § 1333(b)'s omission of the term is presumed purposeful. *See Russello v. United States*, 464 U.S. 16, 23 (1983). Similarly, we see no language that would indicate Congress intended OCSLA to alter the relationship between a statutory employer and employee. Neither we nor the Supreme Court has authority to edit the text, as Chevron evidently imagines. *See, e.g., In re Gardenhire*, 209 F.3d 1145, 1152 (9th Cir. 2000) ("As judges, of course, we must apply statutes as written, not as they should have been written with the benefit of hindsight.").

Beyond its misplaced reliance on *Valladolid* and *Baker*, Chevron's other arguments also fail to support its view that the nexus test must consider only a direct employer's OCS operations. For instance, Chevron argues that

squarely address the question before us, however, and we decline to overread the opinion. We note Chevron does not argue that the jury should have been asked about the OCS activities of *both* Furmanite *and* Chevron. Whether that would be the proper inquiry in a case involving a contractor and subcontractor is therefore not before us.

[9] *See, e.g.*, 43 U.S.C. § 1333(b)(2) (defining "employer" for OCSLA purposes); 33 U.S.C. § 902(4) (defining "employer" for LHWCA purposes); *id.* § 904(a) (discussing liability of an "employer" for compensation and specifying when an "employer" is liable as "contractor" for compensation to employees of a "subcontractor"); *id.* § 905(a) (setting out conditions under which an "employer" enjoys exclusive liability under LHWCA); *id.* § 930 (detailing "employers'" reporting requirements); *id.* § 938 (penalizing an "employer" for certain malfeasance).

failing to restrict the test to direct employers "eliminates the need for a direct employer-employee relationship" under the LHWCA and would give an employee benefits "because of a completely unrelated company's on-OCS operations." We disagree. First of all, Chevron is mistaken that LHWCA benefits necessarily demand a "direct employer-employee relationship." To the contrary, the LHWCA expressly provides that an "employer" includes a "contractor" (*i.e.*, an indirect employer) who may sometimes be liable for benefits to a "subcontractor['s]" (direct employer's) employee. 33 U.S.C. § 904(a). Nor is it true that failing to limit the nexus test as Chevron urges would allow an employee to obtain benefits because of an "unrelated company's on-OCS operations." OCSLA's nexus requirement is separate from its "employer" requirement. An employee may satisfy the first but not the second. *See, e.g.*, *Barger*, 692 F.2d at 340 (treating these as separate requirements). Nor does the nexus requirement override other LHWCA provisions that limit who is liable to pay benefits to non-immediate employees. *See, e.g.*, 33 U.S.C. § 904(a) (contractor liable for benefits "only if . . . subcontractor fails to secure the payment of compensation"). Chevron's arguments pertain only to *Valladolid*'s substantial-nexus test, and it raises no separate argument about its status as an "employer" under the LHWCA.[10] We thus express no view on whether Chevron is Mays' "employer" under the LHWCA, as extended by OCSLA.[11]

---

[10] Chevron argues in passing that its OCS operations should not factor into the nexus test because it could lead to the "absurd" result of Chevron being considered Mays' "employer" for other purposes, such as liability for LHWCA benefits. But there would be nothing "absurd" about that outcome. As already noted, the LHWCA expressly foresees circumstances under which a contractor is liable for LHWCA benefits to a subcontractor's employee. *See* 33 U.S.C. § 904(a).

[11] For instance, Chevron does not argue it is not Mays' employer because Mays' survivors may have received LHWCA benefits from Furmanite's insurer. *See* 33 U.S.C.

Finally, Chevron contends that including its OCS operations in the nexus inquiry violates our decisions in *Frederick v. Mobil Oil Corp.*, 765 F.2d 442 (5th Cir. 1985), and *Gates v. Shell Oil*, 812 F.2d 1509 (5th Cir. 1987). We again disagree. Chevron emphasizes that both decisions held a contractor was not an LHWCA "employer" of a subcontractor's employee—and was thus suable in tort—because the subcontractor paid the employee LHWCA benefits. *See Frederick*, 765 F.2d at 446; *Gates*, 812 F.2d at 1513; *see also* 33 U.S.C. § 905(a). These decisions, however, have nothing to say about the connection between an injury and the OCS. Neither applied (indeed, both long predated) the substantial-nexus test. Instead, the decisions concern when a contractor is an "employer" under the LHWCA, an issue Chevron does not raise. And even had Chevron raised the argument, it is unclear whether these decisions would help it: Chevron disputes[12] that Mays' survivors actually received LHWCA benefits from his direct employer, which was the determinative factor in *Frederick* and *Gates*.[13]

---

§ 905(a) (for exclusive liability purposes, "a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 904 of this title"); *see also Stansbury*, 681 F.2d at 951 (explaining "OCSLA incorporated only the remedies, not the criteria, of the LHWCA," which "includes 33 U.S.C. § 933(i), which provides that the workers' compensation is the exclusive remedy of an injured employee"). That issue is not before us.

[12] In a post-argument supplemental brief, Chevron argues that the plaintiffs "did not introduce any evidence of LHWCA benefits at trial" and that a letter from Furmanite's insurance carrier stating that Mays' survivors "would receive LHWCA benefits" was inconclusive.

[13] *Gates* is unhelpful to Chevron for another reason. It involved a suit under OCSLA § 1333(a)(2)(A), which incorporates state law only to the extent it is "not inconsistent with" federal law. We concluded Louisiana's statutory-employer defense was inconsistent with the LHWCA immunity scheme (under which the contractor was suable). *See* 812 F.2d at 1513–14. In this case, however, we are sitting in diversity, and so it does not matter whether the statutory-employer defense is "inconsistent" with federal law.

In sum, we reject Chevron's argument that the district court erred by instructing the jury to consider Chevron's OCS operations in answering the substantial nexus question.

**B.**

Chevron argues in the alternative that the evidence linking its OCS operations to Mays' death is so "indirect" and "tenuous" that it fails the substantial nexus test as a matter of law. Although Chevron's brief frames this as a legal challenge, it is actually an attack on the jury's factual finding that there was "a significant causal link" between Mays' death and Chevron's OCS operations. That argument faces steep odds: Chevron must show the evidence "point[s] so strongly and overwhelmingly in [Chevron's] favor" that no reasonable jury could have ruled as this one did. *Herster*, 887 F.3d at 184. We must view the evidence in the light most favorable to the plaintiffs, *id.*, and we cannot "make credibility determinations or weigh the evidence, as those are jury functions." *N. Cypress Med. Ctr.*, 898 F.3d at 473 (cleaned up). On top of all that, we are "especially deferential" to jury verdicts. *MultiPlan*, 937 F.3d at 494 (citation omitted). Measured against those daunting standards, Chevron's argument falls short.

The substantial nexus question submitted to the jury is "fact-specific" and "depend[s] on the individual circumstances of each case." *Baker*, 834 F.3d at 548–49 (quoting *Valladolid*, 565 U.S. at 222). Chevron essentially quarrels with the weight the jury gave certain facts. For instance, it argues that only "some" of the gas released from the valve Mays breached "originated from on-OCS facilities." Similarly, it points out that only "some" of the Henry System platforms shut down in the wake of Mays' accident were on the OCS. Chevron claims these facts show "neither a significant nor direct link" between Mays' death and Chevron's OCS operations. But the jury could have drawn different inferences from the

evidence as a whole. For example, the jury heard expert testimony from an engineer that the gas that escaped from the breached valve was extracted from the OCS and was a "direct factor in Mr. Mays' fatal injury." The jury also heard uncontested evidence that the platform Mays was working on when he was killed was connected to two OCS platforms and that gas flow from those specific platforms had to be shut down because of the accident.[14] There was also testimony that Furmanite maintained and repaired Chevron's valves "extensively" and that Chevron had contracted with Furmanite for valve services on the Henry System, including for its on-OCS platforms. As the district court correctly concluded, this evidence presented a jury question as to whether there was a significant causal link between Mays' death and OCS activities. Chevron fails to explain why the jury's affirmative finding was so contrary to the overwhelming weight of the evidence as to be irrational. *See Herster*, 887 F.3d at 184. Instead, Chevron effectively asks us to reweigh the evidence, something we cannot do. *See MultiPlan*, 937 F.3d at 494; *N. Cypress Med. Ctr.*, 898 F.3d at 473.

Chevron relies heavily on our decisions in *Herb's Welding v. Gray*, 766 F.2d 898 (5th Cir. 1985), and *Baker*, 834 F.3d 542, but neither is on point. *Herb's Welding* is superficially similar to Mays' case: it involved an OCSLA benefits claim by a welder injured while working on a fixed rig in Louisiana waters connected indirectly to an OCS platform. *See* 766 F.2d at 899–900.

---

[14] This is precisely the kind of evidence that led the district court to reverse its initial summary judgment in Chevron's favor. As the court explained, the plaintiffs' evidence showed that "pressurized natural gas *originating from the OCS* was being transported by pipeline *through the valve on the Lighthouse platform which Mr. Mays was attempting to repair at the time of his death*." The court also relied on evidence that "at least one OCS platform transported natural gas by pipeline to and through the valve at issue (Tiger Shoals A – 217A), and two OCS platforms had to be shut in to stop the release of pressurized gas through the pipeline and valve involved in Mr. Mays' death."

The likeness ends there, however. Unlike our case, the injury in *Herb's Welding* was not linked in any way to gas produced on the OCS, nor did the incident cause the shut-down of OCS platforms.[15] Furthermore, the decision (from 1985) applied an embryonic version of our court's "situs-of-injury" test, which was eventually rejected in *Valladolid*.[16] *Baker* is even further afield: it involved a marine carpenter injured on land while building a housing module "which would ultimately be integrated into an [offshore platform], which would ultimately be placed on the OCS." 834 F.3d at 544, 548. We affirmed the Benefit Review Board's ("BRB") decision that Baker's work was "too attenuated" from OCS activities to satisfy the substantial nexus test. *Id.* at 549. We reject Chevron's argument that *Baker* is "analogous" to this case because Mays also spent much of his employment on land[17] and

---

[15] Gray injured his knee running away from an explosion caused when he burned through a gas flow line. *See Herb's Welding v. Gray*, 470 U.S. 414, 416–17 (1985). Nothing in the various opinions suggests any concrete link between Gray's injury and gas from the OCS. Nor, unlike our case, was Gray's rig directly connected to an OCS platform. Rather, "the platform on which [Gray] was injured was connected by a gas flow line to a second platform within state waters which in turn was connected by a flow line to a third platform located on the shelf." *Herb's Welding*, 766 F.2d at 899–900. Because this case lends no help to Chevron in any event, we need not consider how the substantial-nexus test might apply to it.

[16] *See id.* at 900 ("Under our decision, an employee's [OCSLA] coverage will change depending on the rig to which he is assigned on a particular day."); *see also Valladolid*, 565 U.S. at 215 (rejecting our situs-of-injury test because "nothing in [the] language [of § 1333(b)] suggests that the injury to the employee must occur on the OCS").

[17] Chevron argues in passing that the district court wrongly excluded evidence that Mays spent 90% of his time working on land. We need not consider whether this was an abuse of discretion because Chevron—in barely one page devoted to this issue—makes no attempt to explain why the exclusion affected Chevron's "substantial rights." *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994); *see, e.g.*, *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (explaining an issue is waived if brief "only repeat[s] conclusory assertions" and "fail[s] to offer any supporting argument or citation to authority" (citing Fed. R. App. P. 28(a)(8)); *Willis v. Cleco Corp.*, 749 F.3d 314, 319 (5th Cir. 2014); *see also United States v. Scroggins*, 599 F.3d 433, 446–47

because Furmanite was not "direct[ly]" involved in Chevron's OCS activities. Baker's injury had a wafer-thin connection to OCS extraction, whereas the evidence here supports finding a more substantial connection between Mays' death and OCS extractive operations. Finally, both *Herb's Welding* and *Baker* involved our *de novo* review of BRB decisions, whereas this case involves our review of a jury verdict to which we are "especially deferential." *MultiPlan*, 937 F.3d at 494 (citation omitted); *cf. Baker*, 834 F.3d at 545 (reviewing existence of LHWCA coverage as "a pure question of law," where facts undisputed).

In sum, we reject Chevron's argument that the evidence linking its OCS operations to Mays' death failed to meet the substantial nexus test as a matter of law. We therefore cannot disturb the jury's finding on that issue.

## C.

Finally, Chevron claims the district court abused its discretion by refusing to reduce the jury's $2 million loss-of-affection award to Mrs. Mays. We disagree.

A federal court sitting in diversity applies state remittitur standards. *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008) (citation omitted). Under Louisiana law, "[a]n appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion." *Miller v. LAMMICO*, 2007-1352 (La. 1/16/08), 973 So.2d 693, 711 (citations omitted). The reviewing court first examines the specific case's "facts and circumstances," and only if that reveals an abuse of discretion does the court "resort to a review of prior similar awards." *Id.* (citations omitted). "It is

---

(5th Cir. 2010) ("It is not enough to merely mention or allude to a legal theory." (citation omitted)).

well-settled that vast discretion is accorded to the trier of fact in fixing general damages awards . . . such that an appellate court should rarely disturb an award of general damages." *Purvis v. Grant Par. Sch. Bd.*, 2013-1424 (La. 2/14/14), 144 So. 3d 922, 927–28 (citations omitted); *see also* LA. CIV. CODE art. 2324.1.

Chevron highlights three facts which, it claims, show abuse of discretion in the damages award. First, Mays died "instantly," with no "pre-death pain and suffering." Second, Mrs. Mays did not witness her husband's death nor "suffer any distress associated with watching her husband's condition become progressively worse." Third, Chevron claims the record does not show Mrs. Mays suffered "extraordinary" mental distress, requiring "medical or psychiatric treatment due to the accident." Claiming the district court abused its discretion by overlooking these facts, Chevron cites eight "comparable" wrongful-death cases with awards ranging from $300,000 to $1.5 million, urging that Mrs. Mays' award should have been reduced to $700,000 at most.

We are not persuaded. In rejecting Chevron's remittitur motion, the district court found that Mrs. Mays "provided compelling testimony" about the loss of her husband's affection. They were married nearly 40 years. Asked to name her favorite memory of her husband, she testified, "[H]e is my memory. I was with him from the time I was 17." Mrs. Mays also testified that she and Mays had nearly finished building their retirement home, where they planned to "sit on the back porch and drink coffee all day." On the day Mays was killed, Mrs. Mays received news of his death while waiting for him at a casino in Marksville, where they had planned to spend the weekend to celebrate their 39th wedding anniversary. She collapsed and had to be carried out. The district court also observed that Mrs. Mays "could not see [Mays'] body post-accident because it was so badly mangled." And because of the

No. 19-30535

time spent floating in the gas-tainted water, Mays' body had such a strong odor that he could not be buried in the wooden casket he had chosen before he died.

In sum, we are not persuaded that the district court abused its discretion in refusing to reduce Mrs. Mays' award.

\*\*\*

The judgment of the district court is AFFIRMED.